696 A.2d 666

HARLEY DAVIDSON MOTOR COMPANY, INC., PLAINTIFF–RE-
SPONDENT, v. ADVANCE DIE CASTING, INC., NORTHBROOK
PROPERTY AND CASUALTY INSURANCE COMPANY, DE-
FENDANTS–APPELLANTS, AND ABC CORP., AND XYZ CORP.,
DEFENDANTS.

Argued March 17, 1997—Decided July 16, 1997.

*Judson L. Hand* argued the cause for appellants (*Bumgardner, Hardin & Ellis*, attorneys; *William R. Bumgardner*, of counsel and *Mr. Hand* and *Mr. Bumgardner*, on the briefs).

*John I. Lisowski* argued the cause for respondent (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski*, attorneys; *Mr. Lisowski, Robert G. Klinck* and *Steven F. Gooby*, on the briefs).

The opinion of the Court was delivered by

O'HERN, J.

The question in this appeal is whether, in a consumer's products liability action, the claim by a retailer of the defective product for indemnification from a supplier of the product or a component thereof, is subject to the procedural requirements of the entire controversy doctrine. We hold that the requirements of the entire controversy doctrine apply to such claims but agree with the Appellate Division that the notice given to the supplier under *N.J.S.A.* 12A:2–607(5)(a) and to the courts involved in the two matters satisfied the fairness concerns of the entire controversy doctrine.

I

In June 1988, Mario DiMaria was riding his 1977 Harley Davidson (Harley) FXE 1200 Super Glide motorcycle when it was hit by a car. The ball of DiMaria's left foot was on the stationary peg attached to the aluminum front chain housing cover (the cover), which shields the clutch plate and rotating chain.[1] Upon impact, the front bumper of the car hit just behind the peg, driving DiMaria's left foot into the cover which shattered. DiMaria's heel was forced against the exposed rotating chain and clutch plate and both the skin and muscle surrounding his left heel were torn down to the bone.

In 1990, DiMaria sued the driver of the car and Harley Davidson. Against Harley, DiMaria claimed that a defect in the front chain housing cover aggravated his injuries. He alleged that the

---

[1] DiMaria's expert report explains:

[A motorcycle's] front chain housing cover assembly, which includes the cover plate, serves several purposes. It is first a simple cover to protect the clutch plate and chain mechanism from contamination and damage from road debris and corrosion. In addition, it serves as a mounting location for the operator's foot peg through which the foot shift lever assembly penetrates the housing and as a bearing support for the starter motor jack shaft. The operator's foot peg bolts to the front chain housing cover at the elongated opening in the forward portion of the cover.

housing cover had been defectively designed and defectively manufactured. (DiMaria claimed that Harley had designed the cover). The other driver died from unrelated causes while the case was pending. DiMaria settled with her estate for the $100,000 policy limit.

Advance Die Casting, Inc. (Advance) manufactured the cover. By letter dated March 1, 1993, Harley asked Advance to assume Harley's defense against DiMaria and to indemnify Harley against any judgment in the trial scheduled for July 1993. On March 25, 1993, the insurance carrier for Advance declined to assume Harley's defense or to indemnify Harley. Harley renewed its demands on July 14 and July 20, 1993, but failed to join either Advance or its insurance company in the DiMaria action.

DiMaria's trial against Harley took place in July 1993. Harley successfully moved to dismiss the design defect claim. The jury unanimously decided that the front chain housing cover had been defectively manufactured, but that the defect was not the proximate cause of DiMaria's injuries. DiMaria appealed, and on October 31, 1994, the Appellate Division affirmed the finding of a manufacturing defect, but reversed on the issues of causation and damages, and sent the case back for a new trial on these issues. Harley's petition to this Court was denied. 142 *N.J.* 448, 663 *A.*2d 1355 (1994).

In November 1994, Harley wrote to Advance and its insurance company, Northbrook Property and Casualty Insurance Company (Northbrook), and informed them of the Appellate Division's decision. Harley again demanded that Advance or Northbrook assume its defense and agree to indemnify it against any judgment. On January 4, 1995, Northbrook refused to assume the defense or indemnify Harley.

In March 1995, during the pendency of the underlying tort action, Harley filed a separate declaratory judgment action claiming that Advance and Northbrook were obliged to provide a defense for Harley and to indemnify it against any judgment. Pursuant to *Rule* 4:5–1(b)(2), which implements the entire contro-

versy doctrine, Harley informed the court of the underlying action by including as an exhibit in the declaratory judgment action the complaint in the underlying action, its docket number, and the pending retrial date. At no time did a party or court attempt to consolidate the two matters.

On April 28, 1995, before the retrial of DiMaria's case, counsel for Advance and Northbrook attended a settlement conference concerning the underlying claim. On May 1, 1995, attorneys for DiMaria and Harley agreed to a settlement of $150,000. Harley notified Advance of the settlement and Advance agreed that it was reasonable. At the settlement proceeding before Judge Boggia, Harley stated:

> For the purposes of the record, Judge, we have also—we, meaning Harley Davidson Motor Company have sued Northbrook Insurance Company as well as Advance Die Casting in another action. [Northbrook's counsel] has indicated that ... I could put on the record ... [that] the settlement is fair and reasonable under the circumstances.

In August 1995, Advance sought to dismiss the declaratory judgment action on the grounds of lack of personal jurisdiction, because Advance is incorporated and has its place of business in Wisconsin. The trial court dismissed the action on its own motion, on the basis of the entire controversy doctrine. Harley appealed. The Appellate Division reversed and remanded. 292 *N.J.Super.* 62, 678 *A.2d* 293 (App.Div.), *certif. granted in part,* 146 *N.J.* 568, 683 *A.2d* 1163 (1996). The court held that the entire controversy doctrine did not apply because the indemnity action had not accrued until after the settlement.

■ It is well settled that the entire controversy doctrine "does not apply to bar component claims [either] unknown, unarisen, or unaccrued at the time of the original action." *Mystic Isle Dev. Corp. v. Perskie & Nehmad,* 142 *N.J.* 310, 323, 662 *A.2d* 523 (1995). The appellate court reasoned that a cause of action for indemnification accrues when an indemnitee becomes obligated to pay the claim for which indemnification is sought. *Harley Davidson, supra,* 292 *N.J.Super.* at 68, 678 *A.2d* 293 (citing *Holloway v. State,* 125 *N.J.* 386, 399, 593 *A.2d* 716 (1991); *McGlone v. Corbi,* 59

*N.J.* 86, 95, 279 *A.*2d 812 (1971); *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 *N.J.* 55, 81, 159 *A.*2d 97 (1960); and *Cola v. Packer*, 156 *N.J.Super.* 77, 81 n. 2, 383 *A.*2d 460 (App.Div.1977)). The court also determined that Harley's obligation to pay DiMaria arose "only after the settlement of the case," that is, after May 1, 1995, the date when the underlying action was settled. *Ibid.* The court further explained that a stricter interpretation "would ignore, or make mandatory, both the permissive joinder rule, *R.* 4:29–1(a), and the impleader (third-party practice) rule, *R.* 4:8–1(a)." *Ibid.* The panel foresaw a similar effect upon the relevant sections of the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –20, and the New Jersey Tort Claims Act, *N.J.S.A.* 59:9–3 and 3–1. *Ibid.* The court explained that

[w]here the claim against a third-party defendant is for a sequential claim such as indemnification, *R.* 4:8–1 is, and must remain, permissive, not mandatory, except as *R.* 4:28–1(a) (mandatory joinder) may apply.... [Although] this rule is open-ended in its definition of what parties must be joined, there is no blanket rule placing indemnitors in such a mandatory class.

[*Id.* at 68–69, 678 *A.*2d 293.]

The court further explained that the New Jersey Rules of Evidence support the finding that the entire controversy doctrine is inapplicable to the facts in this case. *Id.* at 69, 678 *A.*2d 293. *Evidence Rule* 803(c)(26) provides that an indemnitor who has notice of and an opportunity to defend the first action may be bound by an indemnitee in a second action with the judgment acquired in the first action. In addition, the panel relied on *N.J.S.A.* 12A:2–607(5)(a), a provision of the Uniform Commercial Code that allows a buyer to "vouch in" sellers when the buyer is sued for a product defect by a third party and permits the buyer to bind the seller to the factual determinations in the action when the seller declines to defend the buyer.[2] *Ibid.* The court inter-

---

[2] *N.J.S.A.* 12A:2–607(5)(a) states:

(5) Where the buyer is sued for breach of a warranty or other obligation for which [the] seller is answerable over

(a) [the buyer] may give [the] seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller

preted the statute and the rule as foreseeing separate indemnification actions irrespective of whether the indemnitor was joined as a party to the first action. *Ibid.* Because recent entire controversy doctrine opinions have not displaced the U.C.C. or the rules of evidence, the panel "assume[d] that a subsequent separate suit for indemnification is not barred by the entire controversy doctrine, at least where an indemnitor had been vouched in with notice and an opportunity to defend the underlying action." *Ibid.* Although it would have been more prudent had Harley joined Advance as a third-party defendant in the underlying action, the Appellate Division held that the goals of the entire controversy doctrine were ultimately satisfied through the "vouching-in" procedure. *Id.* at 69–70, 678 *A.*2d 293. The Appellate Division remanded the matter to the Law Division for certain factual inquiries concerning indemnification: (1) whether respondent satisfied the "vouching-in" requirements of *N.J.R.E.* 803(c)(26), and (2) whether petitioners-appellants in fact made the cover at issue. *Id.* at 76, 678 *A.*2d 293. In so doing, the court held both that the entire controversy doctrine did not bar the second action and that there was "ample basis for in personam jurisdiction." *Ibid.* We granted certification limited to the issue of the entire controversy doctrine. 146 *N.J.* 568, 683 *A.*2d 1163 (1996).

## II

We need not review in detail the principles of the entire controversy doctrine. "The objectives behind the doctrine are threefold: (1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation." *Mystic*

---

does not do so [the seller] will be bound in any action against [the seller] by [the] buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend [the seller] is so bound.

*Isle Dev. Corp., supra,* 142 *N.J.* at 322, 662 *A.*2d 523. The entire controversy doctrine strives to further these objectives by requiring that, whenever possible, "the adjudication of a legal controversy should occur in one litigation in only one court." *Cogdell v. Hospital Ctr.,* 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989). "The doctrine requires parties to a controversy before a court to assert all claims known to them that stem from the same transactional facts, even those against different parties." *Joel v. Morrocco,* 147 *N.J.* 546, 548, 688 *A.*2d 1036 (1997). The entire controversy doctrine fosters the "goals of efficient judicial administration and fairness" to parties. *Prevratil v. Mohr,* 145 *N.J.* 180, 187, 678 *A.*2d 243 (1996).

### A.

The Appellate Division opinion suggests that claims for indemnity are not subject to the entire controversy doctrine because they are unaccrued. There may be a class of indemnity claims in which that will be true. *See* Andrew T. Berry, *Application of the Entire Controversy Doctrine to Insurance Coverage Litigation: A Bridge Too Far,* 28 *Rutgers L.J.* 41, 49–52 (1996). But we believe that in the generality of products liability cases, "upstream" claims for contribution or indemnity are within the reach of the doctrine. *Promaulayko v. Johns Manville Sales Corp.,* 116 *N.J.* 505, 516, 562 *A.*2d 202 (1989). Under the doctrine of common-law indemnification, parties held liable for defects in products for which they had no direct responsibility may obtain redress from the culpable party. *Id.* at 511, 562 *A.*2d 202. This Court has said that:

> In the absence of an express agreement between them, allocation of the risk of loss between the parties in the chain of distribution is achieved through common-law indemnity, an equitable doctrine that allows a court to shift the cost from one tortfeasor to another. The right to common-law indemnity arises "without agreement, and by operation of law to prevent a result which is regarded as unjust or unsatisfactory."
>
> [*Ibid.* (quoting W. Keeton, et al., *Prosser & Keeton on The Law of Torts,* § 51 at 341 (5th ed.1984)).]

Generally, common law indemnification shifts the cost of liability from one who is constructively or vicariously liable to the

tortfeasor who is primarily liable. *Adler's Quality Bakery, Inc.,*
*supra,* 32 *N.J.* at 80, 159 *A.*2d 97. This "shifting" of the risk up
the distribution chain to, in most cases, the actual manufacturer of
the offending product, fulfills the basic goal of distributing the risk
to the party best able to bear it. *Promaulayko, supra,* 116 *N.J.* at
513, 562 *A.*2d 202. Thus, as a general rule, indemnification is
expected to follow the chain of distribution. *Ibid.*

*Rule* 4:7–5 governs the procedure for making a cross-claim for
contribution or indemnity against a co-party in a suit. In 1979,
this rule was amended "in accordance with the . . . [entire contro-
versy doctrine] . . . *to require defendants to assert any cross-
claims for contribution and indemnity which they may have
against any other party in the action itself despite the fact that the
cause of action for contribution and indemnity does not technically
accrue until payment of the judgment by that defendant."* Pres-
sler, *Current N.J. Court Rules,* comment 2 on *R.* 4:7–5(b) (1997).
Although *Rule* 4:7–5 applies to joinder of *claims* against parties
already present in the action, not joinder of new parties, the
analysis of accrual for purposes of the entire controversy doctrine
is instructive.

The "factual circumstances giving rise to the controversy itself"
are common to both claims of DiMaria and Harley. *Joel, supra,*
147 *N.J.* at 550, 688 *A.*2d 1036. DiMaria claims that his injuries
were caused by both manufacturing and design defects. Harley
claims that it is entitled to indemnity because of the defects
alleged by DiMaria. DiMaria's case was tried before a jury that
concluded that although a manufacturing defect existed, it was not
the cause of the accident. Application of the doctrine here is
consistent with *Cogdell,* which sets forth a test for determining
when the entire controversy doctrine should apply.

*Cogdell* requires the parties that are to be joined to have a
"material interest" in the judicial outcome of the controversy.
*Cogdell, supra,* 116 *N.J.* at 23, 560 *A.*2d 1169. *Cogdell* defines
"material interest" as "one that can affect or be affected by the
judicial outcome of a legal controversy. . . ." *Ibid.* Advance had a

"material interest" in the outcome of the first controversy because as Harley alleged in its second coverage complaint, Advance manufactured the clutch cover involved in that action and that Harley was a third-party beneficiary of the liability insurance policy of Northbrook issued to Advance. Defendants assert that Harley knew of its claim at the time of the underlying action; that Harley sat on its claim; and that Harley failed to join Advance and Northbrook in the underlying action or to provide the court with the opportunity to decide how to proceed with the various claims and parties. Thus, defendants argue that it is unfair to give plaintiff "a second bite at the apple." *Cogdell, supra,* 116 *N.J.* at 13, 560 *A.*2d 1169.

Because the party-joinder rule "tries foremost to protect an absent person from an adjudication of his or her interests [and] also protects all of society from repetitious, abortive, and wasteful litigation," *id.* at 17–18, 560 *A.*2d 1169, absent the effect of "vouching-in," party-joinder would be required in this action to satisfy the entire controversy doctrine because a jury in the second action would have had to retry the same basic facts of the manufacturing defect. In essence, there would be two trials where one would suffice. *New Jersey Transit Rail Operations, Inc. v. North Jersey Cleaning Service, Inc.,* 277 *N.J.Super.* 367, 649 *A.*2d 908 (Law Div.1994), does not dictate a contrary result. Harley relies on the language in *New Jersey Transit Rail Operations, Inc.* that states "the claim [in the second action] did not accrue until [the plaintiff] was found liable in the prior litigation." *Id.* at 371, 649 *A.*2d 908. However, the later claim for indemnification was allowed because the first court had denied the plaintiff in the first action the right to join the party secondarily liable. *Id.* at 372–73, 649 *A.*2d 908.

The proper theory for analyzing the application of the entire controversy doctrine to this case was set forth by *Newmark v. Gimbel's Inc.,* which involved a suit by a consumer against a retailer of a defective shampoo. The Court held that the retailer of such a product has an action against the manufacturer, who is

primarily responsible for placing the defective product in the marketplace. 54 *N.J.* 585, 600–01, 258 *A.*2d 697 (1969). There, the Court stated:

[c]onsidering the overall problem of prosecuting products liability cases, it would seem to make sense procedurally to have the plaintiff's cause of action … adjudicated in one action against the manufacturer and retailer. If the plaintiff sues the dealer alone, the dealer in his own interest should implead the manufacturer and thus avoid circuity of action.

[*Ibid.*]

In fact, in this case the retailer of the motorcycle and the manufacturer of the component were more properly viewed as joint tortfeasors. The defect could have been due to a design defect or a manufacturing defect or a combination of each. A jury could have apportioned the liability between the two tortfeasors. *N.J.S.A.* 2A:15–5.2; *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 465, 435 *A.*2d 540 (1981).

## B.

 Although the principles of the entire controversy doctrine apply to upstream (and possibly downstream) claims for indemnity in products liability cases, we do agree that in the context of this case the "vouching-in" procedure was a satisfactory substitute for party-joinder since the required notice was given to the supplier pursuant to *N.J.S.A.* 12A:2–607(5)(a). Harley's notice to Advance on March 1, 1993, prior to the first trial, demanded that Advance

agree to immediately assume the defense of Harley–Davidson, Inc. and indemnify Harley–Davidson, Inc. for any damages, costs, fees, or judgments entered against Harley–Davidson, Inc. in this case. This case is presently scheduled for trial on May 11, 1993. Therefore, I ask that you advise of your decision in this matter as soon as possible.

The court in the underlying action (DiMaria's action) was informed, if belatedly, of Harley's claim against Advance, before the first case settled on May 1, 1995. The court in the first case did not defer the settlement of the first claim in order to consolidate the actions; the second court was informed of the first action in plaintiff's complaint filed March 10, 1995. It also took no action to consolidate the claims. The twin pillars of the entire controversy

doctrine, fairness to parties and fairness to the court, were satisfied by these actions of Harley.

### III

Although we find that the requirements of the entire controversy doctrine were satisfied, we advert to other arguments made by the parties. Harley argues that there is an underlying inconsistency in our *Rules of Civil Practice and Procedure* that may have contributed to the misunderstanding of when claim preclusion occurs under the entire controversy doctrine. *Rule* 4:30A states: *"Non-joinder of claims* or parties required to be joined by the entire controversy doctrine *shall result in the preclusion of the omitted claims* to the extent required by the entire controversy doctrine...." (Emphasis added.) However, *Rule* 4:8 (third-party practice) states:

> Within 90 days after the service of the original answer, a defendant, as third-party plaintiff, *may* file and serve a summons and third-party complaint, together with a copy of plaintiff's complaint, upon a person not a party to the action who is or may be liable to defendant for all or part of the plaintiff's claim against defendant and may also assert any claim which defendant has against the third-party defendant involving a common question of law or fact arising out of the same transaction or series of transactions as the plaintiff's claim.
>
> [*R.* 4:8–1(a) (emphasis added).]

Harley emphasizes that although *Rule* 4:30A has preclusive effect, *Rule* 4:8 speaks in the permissive when it says "may join."

In contrast, *Rule* 4:7–5 (cross-claim rule) requires mandatory joinder of claims for indemnity against a party to an action:

> A defendant *shall assert a claim for contribution or indemnity against any party to the action* by inserting in the answer ... a general demand for contribution or indemnity from a named party and specifying the statute under which such claim is made, but without setting forth the facts upon which the claim is based. If a claim for contribution or indemnity is made, the answer shall be served upon the parties against whom such relief is sought and no responsive pleading thereto need be filed.
>
> [*R.* 4:7–5(b) (emphasis added).]

Advance argues that the Appellate Division ignored the impact of *Rule* 4:7–5 in determining that Harley's indemnification claim against Advance did not accrue until DiMaria and Harley settled.

Advance asserts that in ruling that Harley's claim was "unaccrued," the Appellate Division took the word out of its proper context. Advance argues that "[a]fter the 1979 revisions to *R.* 4:7–5, the fact that a claim has not 'accrued,' in the technical sense of starting the statute of limitations period to run, does not affect the impact of the entire controversy doctrine upon that claim." *See Bendar v. Rosen,* 247 *N.J.Super.* 219, 237, 588 *A.*2d 1264 (App.Div.1991) (stating that "[w]hile technically a right of contribution does not arise until a tortfeasor has paid more than his pro rata share, ... the entire-controversy doctrine and judicial economy militate for the claim being asserted in the underlying [ ] action"). This Court has stated that "[t]he accrual of a cause of action [for purposes of the entire controversy doctrine] occurs when a plaintiff knows or should know the facts underlying those elements, not necessarily when a plaintiff learns the legal consequences of those facts." *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 296, 662 *A.*2d 509 (1995).

We acknowledge that refinements in our *Rules of Civil Practice and Procedure* may be required to clarify the circumstances in which the entire controversy doctrine may apply. In *Olds v. Donnelly,* 150 *N.J.* 424, 696 *A.*2d 633 (1997), also decided today, we have referred to the Civil Practice Committee the task of reviewing the rules for application of the doctrine. We direct that committee to consider specifically whether *Rule* 4:8 (third-party practice rule) should be amended in light of the entire controversy doctrine.

To repeat, we do not exclude as a class all third-party claims for indemnity from the reach of the entire controversy doctrine. Some forms of indemnity will truly not have accrued until the conclusion of the underlying litigation. *See generally* Berry, *A Bridge Too Far, supra,* 28 *Rutgers L.J.* 41. However, in a products liability action, a claim for common-law indemnification from a third party should ordinarily be joined in the original action because of related issues of contribution. Harley's use of

the "vouching-in" procedure and notice to both courts satisfied the fairness requirements of the entire controversy doctrine.

The judgment of the Appellate Division is affirmed and remanded to the trial court for consideration of the remaining issues.

STEIN, J., concurring.

I concur in the judgment of the Court for the reasons stated in my separate opinion in *Olds v. Donnelly*, 150 *N.J.* 424, 696 *A.2d* 633 (1997), also decided today.

Justice STEIN, concurring in the result.

*For affirmance and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.