698 A.2d 543

BROTHER VINCENT MCNALLY AND THE CHRISTIAN BROTH-
ERS INSTITUTE, PLAINTIFFS–APPELLANTS, v. PROVI-
DENCE WASHINGTON INSURANCE COMPANY, DEFEN-
DANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 23, 1997—Decided August 5, 1997.

Before Judges LONG, A.A. RODRÍGUEZ [1] and CUFF.

*William J. Bailey* argued the cause for appellant (*DeCotiis, Fitzpatrick & Gluck*, attorneys; *Edward N. Fitzpatrick*, of counsel; *Mr. Bailey*, on the brief).

---

[1] Judge Rodríguez participated by reviewing an audio tape of the April 23, 1997 oral argument.

*James B. Moran* argued the cause for respondent (*Hoagland, Longo, Moran, Dunst & Doukas,* attorneys; *Mr. Moran,* of counsel; *Paul C. Vitrano,* on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

On August 17, 1988, James Hoy and his parents filed a complaint against several individuals and entities, including Brother Vincent McNally and the Christian Brothers Institute (CBI). The complaint alleged that while a student at Essex Catholic High School in the fall of 1982, James Hoy was sexually assaulted by Brother Andrew Hewitt.

CBI, a non-profit organization affiliated with the Roman Catholic Church, provided education and religious instruction and guidance at Essex Catholic, under a contract with the Archdiocese of Newark. In 1982, Brother McNally served as the religious superior of the high school, pursuant to the assignment by CBI. Brother McNally indicated in a certification that at the time of the alleged sexual assaults, in his capacity as religious supervisor, he "was responsible for overseeing governance of [Essex Catholic], as well as the overall management of same." Further, he stated in the certification that:

> I worked closely with the provincial leadership in CBI's main office in New Rochelle, New York. In my capacity as a Christian Brother, I have taken a vow of poverty and rely entirely on CBI for room, board and financial support. I receive money from CBI for those expenses not paid directly by CBI and I am under the direction and control of CBI's provincial headquarters in New Rochelle, New York.

The Hoys alleged in their complaint that Brother McNally: (1) negligently and/or intentionally failed to report the alleged assaults to the appropriate authorities; and (2) allegedly conspired to conceal the assaults from them.

At the time of the alleged assault, CBI held two policies of insurance with defendant Providence Washington Insurance Company (insurer). The first policy, a business owner's policy, had a $500,000 limit per occurrence and covered liability incurred by

CBI, any executive officer, director, or stockholder while acting within the scope of their duties for all sums which the insured becomes legally obligated to pay as damages because of bodily injury or property damage. The second policy, a commercial umbrella policy, had a $2,000,000 limit per occurrence and covered liabilities of CBI, its executive officers, directors, stockholders, or other employees while acting within the scope of their duties for which the insured becomes legally obligated to pay on account of, among other things, personal injury. In this policy, "personal injury liability" is defined as meaning, among other things, "bodily injury, sickness, disease, disability, shock, mental anguish and mental injury." The umbrella policy provided coverage over underlying policies or self-insured retention where there was no underlying coverage. Both policies in effect at the time of the alleged incident provided for defense and indemnification of the insureds. Additionally, both policies contain "no action" clauses which, in relevant part, prohibit an action against the insurer "until the amount of the insured's obligation to pay ... shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the [insurer]." Both policies also indicate that the insured does not have the right to join the insurer as a co-defendant in any action against the insured to determine the insured's liability.

On October 20, 1988, John Duffy, general counsel for CBI, directed a copy of the Hoy complaint to the insurer. On November 15, 1988, Ross Wasielke, branch claim manager for the insurer, informed Duffy that Brother Hewitt was not an "insured" under the policies.

Apparently there was no further contact between the insurer and Duffy until July 7, 1989, at which time Duffy informed Wasielke that the law firm of Clapp & Eisenberg, counsel for Brother McNally, believed there was a negligence claim in the Hoy litigation against Brother McNally and/or CBI.

Approximately one year later, on July 10, 1990, Duffy again wrote Wasielke and informed him that CBI had not yet been named a party defendant in the Hoy litigation. He also stated that Clapp & Eisenberg advised him there may be a statute of limitations defense, but "none of us would prefer to have to plead such a defense if we do not have to do so." He went on to note:

It appears that a Louisiana attorney has suddenly made his appearance in the case perhaps too well known. He is, we are advised, the attorney for the excess carrier which covers the Archdiocese. He and his company are putting pressure on the Archdiocese obviously seeking to force an early settlement. To that end he wants to see the policy which "insures" Bro. McNally. Of course, there is no such policy!

Our attorneys, Ed Fitzpatrick and John Lloyd of Clapp & Eisenberg ("C & E") do not wish to disclose your policy since they fear it might somehow come to the attention of plaintiff's counsel who might then seek to join the Institute as a party defendant.

They're also concerned that counsel might seek disclosure by means of a motion which would bring it to plaintiff's attention.

We discussed possible alternatives:

a) C & E could permit counsel to review your policy in their office.

b) C & E could attempt to harden the Archdiocese's position vis-a-vis their excess carrier, if that is at all possible.

c) C & E could offer their letter averring that McNally is uninsured and has taken the vows of poverty, chastity and obedience.

Wasielke responded on July 11, 1990 and suggested that Clapp & Eisenberg indicate that Brother McNally is uninsured and has taken the vows of poverty, chastity and obedience.

Subsequently, on September 14, 1990, John R. Lloyd of Clapp & Eisenberg, wrote to Wasielke confirming a conversation two days earlier, in which Wasielke informed Lloyd that Brother McNally was not covered under any policy issued by the insurer. In the letter, Lloyd notified Wasielke that copies of the policies covering CBI were being provided to counsel for the Archdiocese.

The next documented contact between representatives of Brother McNally and the insurer was October 13, 1992, at which time Ed FitzPatrick of Clapp & Eisenberg sent a letter to Scott Lazar, who was at that time counsel for the insurer. The letter stated in relevant part:

[I]t is clear that Brother McNally would be covered....

We would urge that you read the policy and advise [the insurer] that McNally is insured and that they ought to immediately meet their responsibility both as to a defense and settlement in order to resolve this litigation.

Your client was advised of this law suit years ago and disclaimed coverage. In our view that disclaimer was in bad faith and we will be advising our client to institute suit if we are not able to reach an amicable settlement with [the insurer] (unfortunately that probably means tomorrow).

Since you are only a couple of blocks from my office, you should also know that my entire file is open to you in order that we can be of assistance to you. While it is clear that your late entry into the matter handicaps you; nonetheless your client has known about the matter for years and I have made, over the last several months, at least a dozen telephone calls trying to get their attention.

On October 14, 1992, FitzPatrick sent another letter to Lazar in which he stated that due to CBI's inability to contribute more money to the settlement, the Hoy action would proceed to trial. He further noted that "[CBI] and Brother McNally will hold [the insurer] accountable for all damage assessed by the jury."

On October 15, 1992, the Hoy case settled, apparently for $475,000, with CBI contributing $40,000 on behalf of Brother McNally.

From October 1992 through 1993, the insurer was contacted several times by Clapp & Eisenberg regarding coverage for Brother McNally's portion of the settlement and legal fees in connection with the Hoy matter. The insurer maintained its position that the relevant policies did not cover Brother McNally.

On June 2, 1995, plaintiffs, Brother McNally and CBI through their new attorneys, the law firm of DeCotiis, Fitzpatrick & Gluck, filed a complaint against the insurer seeking legal fees and settlement costs incurred during the Hoy litigation, arguing that the insured wrongfully refused to defend and indemnify the plaintiffs as per the terms of the umbrella policy and the comprehensive liability policy.

The insurer moved for summary judgment. On May 16, 1996, the trial judge issued a letter opinion in which he dismissed the complaint as barred by the entire controversy doctrine because: (1) the facts in the coverage case are sufficiently related to those

at issue in the Hoy action; and (2) plaintiffs' current claim arose, was known, and could have been asserted in the underlying action. *See DiTrolio v. Antiles,* 142 *N.J.* 253, 267, 274, 662 *A.2d* 494 (1995); *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 290, 662 *A.2d* 509 (1995). Plaintiffs' position that the current claims did not accrue until the settlement and that the "no-action" clauses in the policies precluded them from earlier instituting litigation against the insurer were rejected by the judge:

> [T]he precise claims that plaintiffs now assert, their entitlement under the [defendant's] insurance policies to have the company fund the costs of Brother McNally's defense and contribution to the settlement, could have been brought and resolved during the *Hoy* litigation if they had instituted a declaratory judgment action against [defendant].
>
> In addition, the plaintiffs argued that the "no-action" clause contained in the [defendant] policies precluded them from instituting litigation against the insurer. *Condenser* and *Kielb* are clear, however, that a "no-action" clause can not prevent an insured from asserting a declaratory judgment action against its insurer.

This appeal followed.

Plaintiffs argue on appeal that the trial judge erred when he dismissed the complaint based on the entire controversy doctrine because (1) the "no-action" clause contained in both relevant policies prevented plaintiffs from bringing suit against the insurer until the damages were ascertained by a final determination; (2) plaintiffs were not required to seek a declaratory judgment; and (3) a cause of action for indemnification does not accrue until the indemnitee becomes responsible to pay on the claim. We reverse.

*I*

We turn first to plaintiffs' argument that the no-action clauses in the policies prohibited them from earlier instituting any litigation against the insurer, thus obviating entire controversy considerations. This is not correct. As the trial judge ruled, the no-action clauses prohibited naming the insurer as a defendant in the underlying litigation but did not interdict the filing of a declaratory judgment action regarding coverage. *See Kielb v. Couch,* 149 *N.J.Super.* 522, 374 *A.2d* 79 (Law Div.1977); *see also*

*Condenser Serv. & Engineering Co. v. American Mut. Liability Ins. Co.*, 45 *N.J.Super.* 31, 131 *A.*2d 409 (App.Div.), *certif. denied*, 24 *N.J.* 547, 133 *A.*2d 395 (1957). A declaratory action is not a prerequisite to indemnification, but rather a matter of choice. *See Kielb, supra*, 149 *N.J.Super.* at 526, 374 *A.*2d 79 ("upon defendant's refusal to provide a defense the plaintiff could have instituted a declaratory judgment proceeding to adjudicate the question of coverage, which was not done, *or* proceed with his own defense and, as he is not doing, seek to obtain reimbursement from defendant company" (emphasis added)). In short, plaintiffs were entitled but not compelled to file a declaratory action for coverage. The existence of this option eliminates plaintiffs' use of the no-action clauses as a shield against an entire controversy claim.

## II

Plaintiffs' next contend that their cause of action did not accrue until the resolution of the underlying litigation and that the entire controversy doctrine does not apply to unaccrued claims. To put this issue in perspective, some background on the entire controversy doctrine is necessary.

Originally, the entire controversy doctrine mandated joinder of only those claims arising from "the same overall transaction" involving the parties already named in the lawsuit. *DiTrolio, supra*, 142 *N.J.* at 266, 662 *A.*2d 494. "The rule has been extended to include all affirmative claims that a party might have against another party, including counterclaims and cross-claims . . . as well as joinder of all parties with a material interest in the controversy, *i.e.*, those who can affect or be affected by the judicial outcome of the controversy." *Circle Chevrolet, supra*, 142 *N.J.* at 289, 662 *A.*2d 509 (citing *Cogdell v. Hospital Center at Orange*, 116 *N.J.* 7, 23, 26, 560 *A.*2d 1169 (1989); *R.* 4:30A).

In response to *Cogdell, R.* 4:30A was adopted, which provides that "[n]on-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controver-

sy doctrine. . . ." The rule does not define the doctrine since that is best left to case law. Pressler, *Current N.J. Court Rules*, comment 1 on *R.* 4:30A (1997). Application of the doctrine is discretionary, and its limits are left to a case-by-case determination. *Circle Chevrolet, supra,* 142 *N.J.* at 290, 662 *A.*2d 509.

"The entire controversy doctrine seeks to further the judicial goals of fairness and efficiency by requiring, whenever possible, 'that the adjudication of a legal controversy should occur in one litigation in only one court.'" *Id.* at 289, 662 *A.*2d 509 (quoting *Cogdell, supra,* 116 *N.J.* at 15, 560 *A.*2d 1169). The doctrine requires that a party who has elected to hold back from an initial lawsuit a related component of the controversy be barred from thereafter raising it in a subsequent proceeding. *Wm. Blanchard Co. v. Beach Concrete Co., Inc.,* 150 *N.J.Super.* 277, 292–93, 375 *A.*2d 675 (App.Div.), *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 507 (1977). Moreover, if during the pendency of litigation, a constituent claim arises which is part of the entire controversy, the claimant must seek leave to file a supplemental pleading thereby submitting to judicial discretion the determination of whether the claim should be joined in that action or reserved for a subsequent suit, and if the claimant fails to so move, he will ordinarily be barred from raising the claim in a subsequent suit. *Brown v. Brown,* 208 *N.J.Super.* 372, 381–82, 506 *A.*2d 29 (App. Div.1986).

In determining whether successive claims constitute one controversy for purposes of the entire controversy doctrine, the focus is on whether the claims arise from related facts or the same transaction or series of transactions. *DiTrolio, supra,* 142 *N.J.* at 267, 662 *A.*2d 494. "It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding." *Id.* at 267–68, 662 *A.*2d 494. In the absence of such a factual nexus, a party is not required to join all of its claims against another party in a single action. *See Joel v. Morrocco,* 147

N.J. 546, 550, 688 A.2d 1036 (1997); *Illiano v. Seaview Orthopedics,* 299 *N.J.Super.* 99, 106–07, 690 A.2d 662 (App.Div.1997).

If the consequences of omitting a component of a controversy means that the litigants, after final judgment is entered, will likely "have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation." *Wm. Blanchard, supra,* 150 *N.J.Super.* at 293–94, 375 A.2d 675. The point is that a component of the controversy may not be unfairly withheld. Withholding is unfair "if its effect is to render the pending litigation merely one inning of the whole ball game." *Id.* at 294, 375 A.2d 675.

"The [entire controversy] doctrine is equitable in nature and is fundamentally predicated upon 'judicial fairness and will be invoked in that spirit.'" *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 261, 597 A.2d 1101 (App.Div.1991) (quoting *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 343, 476 A.2d 250 (1984)). As with other discretionary standards, "a particularized evaluation is required to determine whether the policies sought to be fostered by the doctrine require its application as a preclusive principle when balanced against a litigant's right to tailor separate causes of action." *DiTrolio v. Antiles,* 276 *N.J.Super.* 234, 247, 647 A.2d 1318 (App.Div.1994), *rev'd on other grounds,* 142 *N.J.* 253, 662 A.2d 494 (1995). The policies sought to be fostered by the doctrine are threefold: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *Circle Chevrolet, supra,* 142 *N.J.* at 289–90, 662 A.2d 509 (quoting *DiTrolio, supra,* 142 *N.J.* at 267, 662 A.2d 494). Thus, the doctrine furthers the twin goals of efficient judicial administration and fairness to litigants. *Woodward–Clyde*

*Consultants v. Chemical and Pollution Sciences, Inc.*, 105 *N.J.* 464, 472, 523 *A.*2d 131 (1987).

It is well recognized that the entire controversy doctrine does not bar related claims which have not arisen or accrued during the pendency of the original action. *Milkap Corp. v. Industrial Constr. Co., Inc.*, 281 *N.J.Super.* 180, 185–86, 656 *A.*2d 1292 (App.Div.1995); *Fisher v. Yates*, 270 *N.J.Super.* 458, 469–70, 637 *A.*2d 546 (App.Div.1994). A cause of action for indemnification has traditionally been considered to accrue when an indemnitee becomes responsible to pay on a claim. *Holloway v. State*, 125 *N.J.* 386, 399, 593 *A.*2d 716 (1991); *McGlone v. Corbi*, 59 *N.J.* 86, 95, 279 *A.*2d 812 (1971); *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 *N.J.* 55, 81, 159 *A.*2d 97 (1960); *Cola v. Packer*, 156 *N.J.Super.* 77, 81 n. 2, 383 *A.*2d 460 (App.Div.1977); *New Jersey Transit Rail Operations, Inc. v. North Jersey Cleaning Services, Inc.*, 277 *N.J.Super.* 367, 371, 649 *A.*2d 908 (Law Div.1994). In accordance with this general rule, a panel of this Court recently held that claims for indemnity in a products liability case were not subject to the entire controversy doctrine because they were unaccrued. *Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc.*, 292 *N.J.Super.* 62, 68, 678 *A.*2d 293 (App.Div.1996), *aff'd*, 150 *N.J.* 489, 696 *A.*2d 666 (1997). On review, the Supreme Court disagreed with the expansiveness of this general statement,[2] holding that some indemnification claims are accrued and that some are not. *Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc.*, 150 *N.J.* 489, 497, 502, 696 *A.*2d 666 (1997). More particularly, the Court identified "upstream" claims for common law indemnification in products liability actions as subject to the entire controversy doctrine. *Id.* at 497, 696 *A.*2d 666. Although cast in terms of accrual, it seems to us that the Court actually

___

[2] The decision of this Court allowing the indemnification claims to proceed despite the entire controversy doctrine was affirmed on an alternative basis: that the "vouching-in" procedure of *N.J.S.A.* 12A:2–607(5)(a) was a satisfactory substitute for party-joinder. *Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc.*, 150 *N.J.* 489, 500–01, 696 A.2d 666 (1997).

made a policy determination that such claims, which shift the risk up the distribution chain from vicariously liable parties to the primarily liable tortfeasor, should ordinarily be joined in the original proceeding because of related issues of contribution.[3] *Id.* at 502, 696 *A.*2d 666. Further, despite its obvious disinclination to draw clear lines between the kinds of indemnification claims which are accrued for entire controversy purposes and those which are not, the Court recognized that there exists a class of indemnification cases which "will truly not have accrued until the conclusion of the underlying litigation" and which therefore should escape the strictures of the entire controversy doctrine. *Ibid.* While the Court did not describe with exactitude the kinds of indemnification claims which fall within this class, by its repeated citation to a law review article (Andrew T. Berry, *Application of the Entire Controversy Doctrine to Insurance Coverage Litigation: A Bridge Too Far,* 28 *Rutgers L.J.* 41 (1996)), this much seems clear: that it agrees with that author's conclusion that the entire controversy doctrine should not be applied to require joinder of insurers in tort cases or reinsurers in insurance coverage cases.[4] *See Harley Davidson, supra,* 150 *N.J.* at 497, 502, 696 *A.*2d 666. The former is what is before us and, based on *Harley Davidson,* we hold that the trial judge erred in ruling that the suit by McNally and CBI for settlement costs and legal fees incurred in the Hoy litigation, of which the insurer was fully cognizant from the outset, was barred by the entire controversy doctrine.

---

[3] In *Olds v. Donnelly,* 150 *N.J.* 424, 696 *A.*2d 633 (1997), the Court was faced with yet another entire controversy issue: whether an attorney malpractice action must be filed while the underlying case is pending. Again invoking policy considerations (i.e., a "chill" on attorney-client relations and "jeopardy" to attorney-client confidences), the Court excluded legal malpractice claims from the scope of the entire controversy doctrine. *Id.* at 461–64, 696 *A.*2d 633; *see also Donohue v. Kuhn,* 150 *N.J.* 484, 696 *A.*2d 664 (1997) and *Karpovich v. Barbarula,* 150 *N.J.* 473, 696 *A.*2d 659 (1997).

[4] Because *Harley Davidson* included, along with the "upstream" products liability claims, an insurance coverage claim, the Court had the opportunity to declare this principle directly, but declined to do so.

We reverse the order dismissing plaintiffs' claims on entire controversy grounds and remand for proceedings consonant with this opinion.