Brian TODARO, et al., Plaintiffs,

v.

**THE TOWNSHIP OF UNION,
etc., Defendant.**

No. CIV. A. 97–4875.

United States District Court,
D. New Jersey.

Nov. 17, 1998.

## ORDER

Renee C. Vidal, Cureton, Caplan & Clark, Mt. Laurel, NJ, for Plaintiffs.

John C. Marcolini, Weiner, Lesniak, Parsippany, NJ, for Defendant.

## OPINION

WOLIN, District Judge.

This matter comes before the Court on cross-motions for summary judgment filed by plaintiffs Brian Todaro, et al., and defendant Township of Union. The Court has decided this matter pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth herein, plaintiffs' motion for summary judgment on count one of the amended complaint will be denied. Defendant's motion for summary judgment will be held in abeyance as to count one of the amended complaint pending the completion of certain limited discovery, and will be granted as to count two of the amended complaint.

## BACKGROUND

The plaintiffs in this action are eleven private individuals who served as special law enforcement officers ("plaintiffs") for the Township of Union ("Township" or "defendant"), a municipal corporation of the State of New Jersey.[1] In the first count of their amended complaint, plaintiffs seek remuneration under the minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., for hours of "town duty" they performed for the defendant without compensation. In their second count, plaintiffs seek reinstatement and remuneration for what they allege was the defendant's retaliatory termination of their status as SLEOs.

Plaintiffs have moved for summary judgment on the first count of the amended complaint, and defendant has moved for summary judgment on both counts of the amended complaint.

### A. Rules Governing SLEOs

Pursuant to the Special Law Enforcement Officers' Act (the "Act"), a New Jersey municipality may appoint SLEOs "to temporarily or intermittently perform duties similar to those performed regularly by members of a police force of a local unit, or to provide assistance to a police force during unusual or emergency circumstances . . . ." N.J.S.A. § 40A:14–146.9(h); see also § 40A:14–146.10(a). SLEOs may be appointed for terms of up to one year, and an appointment may be revoked for cause after an adequate hearing. Reappointment is not automatic at the end of each term. See N.J.S.A. § 40A:14–146.14(a); Township of Union Code ("Union Code") § 71–30(A), (B), (E).

SLEOs are subject to various conditions and requirements specified not only in the Act, but also in applicable municipal ordinances (the "Union Code") and in the Township of Union Special Police Rules and Regulations ("SPR & R"), as memorialized in General Orders ("GO") and Directives ("DO") issued by the Township's chief of police.

For instance, SLEOs must be residents of the Township and must undergo the same psychological testing required of regularly appointed police officers. See N.J.S.A. § 40A:14–146.10(b)(6); Union Code § 71–30(B)(1), (6). SLEOs must successfully complete a training course approved by the Police Training Commission, and may not be issued firearms unless they successfully complete the same basic firearms course required for regular police officers. See N.J.S.A. 40A:14–146.11(a); Union Code § 71–31. SLEOs may carry firearms only when "engaged in the actual performance of the officer's official duties and when specifically authorized by the chief of police . . . ." N.J.S.A. § 40A:14–146.14(b); Union Code § 71–32. The Act provides that SLEOs "shall be under the supervision and direction of the chief of police . . . ." N.J.S.A. § 40A:14–146.14(c).

Pursuant to local ordinance, SLEOs are obligated to perform four hours of "town duty" each week:

> All special law enforcement officers *shall be prepared to serve* the Township of Union as such in an official capacity by devoting at least four (4) hours weekly to police work of the township and such additional assignments as they may be called upon to perform as designated by the Chief of the Police Division.

Union Code § 71–39 (emphasis added).

This ordinance is supplemented by the SPR & R, which provides:

> TOWN DUTY—Any public safety and law enforcement functions which a special police officer performs for the Township, and for which he/she receives no compensation, shall be deemed as "town duty". Except as otherwise provided for herein, every special police officer *shall be required to perform* a minimum of 4 hours of town duty each and every week, and such additional town duty as he/she may be called upon to perform by the Chief of Police.
>
> a. Whenever a special police officer fails to satisfy his/her required minimum town duty hours for a given week, said

---

1. One additional plaintiff, Paul Cheety, withdrew from the proceedings pursuant to a Stipulation and Consent Order of Withdrawal entered by the Court on June 15, 1998.

hours shall be added to and become part of his/her minimum town duty requirements for the following week. A special police officer who is in arrears of his/her town duty obligations shall be prohibited from performing "job-in-blue" duty until such outstanding town duty obligations are satisfied. A special police officer who is in arrears of 20 hours or more of his/her town duty obligations shall be subject to suspension and possible termination from the Special Police.

GO:87–001.03 (emphasis added).

Prior to October 2, 1995, after SLEOs had been appointed by the Township, and as long as they were not in arrears in their town duty hours, they were eligible to accept certain paid assignments designated as "jobs-in-blue." *See* Union Code § 71–38. "Job-in-blue duty" is defined as follows:

JOB–IN–BLUE DUTY—Any public safety function which a special police officer performs on behalf of the Township for a public or private entity, and for which he/she receives compensation at the rate established by Township resolution and in accordance with departmental regulations concerning same, shall be deemed "job-in-blue duty".

GO 87–001.04.

Jobs-in-blue consist largely of traffic, crowd control, or security work performed for private or governmental entities (usually private), known as "subscribers." *See In re Township of Union, Public Employer, et al.,* 21 NJPER ¶ 26008 (1994) ("PERC–1"). Jobs-in-blue are contracted by the subscriber through the police department, and are scheduled and posted by the jobs-in-blue assignment officer. *See* PERC–1. Until October 2, 1995, regular Township police officers were given the first opportunity to accept jobs-in-blue, then SLEOs, then Union County police officers. *See* PERC–1. The hourly rate of compensation for jobs-in-blue is established set by the Township. *See* PERC–1. The compensation rate set in August 1995 was $20.00 per hour for jobs-in-blue other than construction and strike duty, and $28.00 per hour for construction and strike duty. *See* Declaration of John C. Marcolini, Esq. in Support of Defendant's Motion for Summary Judgment ("Marcolini Decl."), Exh. 15. Compensation is paid directly by the subscriber to the officer performing the job-in-blue, although sometimes the compensation is forwarded to the police department for disbursement. *See* PERC–1. Prior to October 2, 1995, SLEOs were permitted to work up to 16 hours of jobs-in-blue per week. GO 87–001.04. There is no evidence or allegation before the Court that SLEOs were ever promised or guaranteed job-in-blue assignments.

## B. The PERC Decisions

At all times relevant to this lawsuit, plaintiffs were SLEOs appointed by the Township. Plaintiffs assert that they performed town duty "to receive and with the expectation that Plaintiff[s] would receive compensation through Plaintiffs['] eligibility to perform jobs-in-blue." *See* Answer # 22 of each plaintiff's Answers to Interrogatories, Marcolini Decl., Exh. 12. All plaintiffs held full-time, paying jobs in addition to their performance of SLEO town duty and any jobs-in-blue they accepted. *See* Answer # 15 of each plaintiff's Answers to Interrogatories, Marcolini Decl., Exh. 12.

Although the Township's regular police force was represented by the Policemen's Benevolent Association of The Township of Union ("Local 69"), the SLEOs were not members of Local 69, but rather were affiliated with an unrecognized non-collective bargaining group known as Local 7 of the New Jersey State Law Enforcement Officers' Association ("Local 7"). *See* Defendant's Statement of Material Facts, ¶¶ 6–7.

In July 1992, Local 7 filed a petition with the New Jersey Public Employment Relations Commission ("PERC") seeking authority to represent 21 SLEOs from the Township. *See* PERC–1. The Township opposed Local 7's petition, asserting that the SLEOs were volunteers rather than public employees, and also that the Township could not be a public employer of the SLEOs because the SLEOs were not directly compensated by the Township. *See* PERC–1. In the alternative, the Township argued that if the PERC determined that it was an employer of the SLEOs, it should be held to be a joint

employer along with the jobs-in-blue subscribers, thus placing the SLEOs outside the jurisdiction of the PERC because they were at least in part employed by private entities. *See* PERC–1.

The Representation Director of the PERC (the "Director") held fact-finding hearings on Local 7's petition. In his published decision, dated November 7, 1994, the Director discussed the status of the SLEOs in the two different roles they performed—town duty and jobs-in-blue. With regard to the status of the SLEOs when performing town duty, the Director provided a rather cursory analysis:

> The Township asserts that it is not the employer of the special police officers. It argues that special officers are independent contractors. Alternatively, to the extent the specials are employees, it argues that they are employees of the jobs-in-blue subscribers. As far as the Township is concerned, the specials are simply volunteers. The Township concluded that if it is found to be the employer, the subscribers must be found to be joint employers with the Township.
>
> The Township argues that the only work the specials do for the Township is town duty which is performed without pay. Accordingly, the specials are volunteers and not public employees. Regardless of the status of special police while doing town duty work, the specials cannot be considered volunteers while they are doing jobs-in-blue work—for which they are being paid.

The PERC–1 decision includes no additional analysis of the status of the SLEOs when they performed town duty.

The Director proceeded to closely examine the status of the SLEOs when they perform jobs-in-blue. He determined that while SLEOs were in that role, they constituted joint employees of the Township and the private subscribers. Therefore, because the SLEOs were not wholly public employees, the Director concluded that the PERC did not have jurisdiction over Local 7's petition to represent the SLEOs, and dismissed the petition.

Local 7 appealed the dismissal of its petition to the Commissioners of the PERC. The Commissioners affirmed the Director's dismissal for lack of jurisdiction, and on November 28, 1995, issued this interpretation of the Director's findings:

> On November 7, 1994, the Director dismissed the petition. [citation omitted] He found that the only Township work the special police do is uncompensated "town duty" and thus they are volunteers and not public employees. While the special police also performed "jobs-in-blue" duties for private or public entities, the Director concluded that the Commission lacked jurisdiction since we found that the Township and the respective subscribers were joint public-private employers....
>
> The Township has submitted a copy of a directive from the police chief prohibiting special police from working jobs-in-blue .... As a result of the directive, special police are no longer working any jobs-in-blue. The only work special police now perform is uncompensated town duty. In that capacity, the special police are volunteers and not employees within the meaning of the Act.

*In re Township of Union, Public Employer, et al.*, 22 NJPER ¶ 27009 (1995) ("PERC–2").

## C. The Jobs–in–Blue Directive

The "directive" referred to in the PERC–2 decision arose from a growing concern on the part of Township officials about the legality of SLEOs carrying firearms while performing jobs-in-blue. In a letter dated June 22, 1995, the Union County Prosecutor's Office responded to an inquiry from the Township's counsel, James L. Plosia, Jr., regarding whether SLEOs were statutorily permitted to carry firearms while performing jobs-in-blue for private entities ("UCP Letter–1"). *See* Marcolini Decl., Exh. 19. The prosecutor's office noted that the Act provides that an SLEO may carry a firearm only while "engaged in the actual performance of official duties *and* when specifically authorized by the chief of police *and* assuming the officer has satisfactorily completed mandated firearms training." UCP Letter–1, Marcolini Decl., Exh. 19; *see also* N.J.S.A. § 40A:14–146.14(b).

The Act defines SLEOs to be "on duty" as follows:

A special law enforcement officer shall be deemed to be on duty only while he is performing the public safety functions on behalf of the local unit [municipality] pursuant to this act and when he is receiving compensation, if any, from the local unit at the rates or stipends as shall be established by ordinance.

N.J.S.A. § 40A:14–146.14(b). The statute further provides:

A special law enforcement officer shall not deemed to be on duty for purposes of this act while performing private security duties for private employers, which duties are not assigned by the chief of police, ... or while receiving compensation for those duties from a private employer. A special law enforcement officer may, however, be assigned by the chief of police ... to perform public safety functions for a private entity if the chief of police or other chief law enforcement officer supervises the performance of the public safety function.

*Id.*

The prosecutor's office concluded that unless the chief of police specifically assigns an SLEO to perform private security duties, the SLEO may not carry a firearm during such duties. *See* UCP Letter–1, Marcolini Decl., Exh. 19. Additionally, the prosecutor's office noted that in order for an SLEO to qualify as "on duty" when performing security duties for a private entity, not only must the chief of police assign and supervise the SLEO, but payment must be made through the police department, rather than directly from the private subscriber to the SLEO. *Id.*

Subsequently, in a letter dated August 28, 1995, to the Township chief of police, the prosecutor's office confirmed that the chief of police had the "ultimate and exclusive" authority to determine "when and which" SLEOs were "on duty" and therefore authorized to carry firearms ("UCP Letter–2"). *See* Marcolini Decl., Exh. 20. Evidently, the police chief was concerned that a proposed amendment to a local ordinance might serve to abrogate his authority in this regard. *See* letter dated August 3, 1995, from the Union County prosecutor's office to the New Jersey

Attorney General's office ("UCP Letter–3"), Marcolini Decl., Exh. 20. The attorney general's office confirmed the conclusion of the prosecutor's office that the Act conferred upon the police chief alone the authority to determine if and when SLEOs should be permitted to carry firearms. *See* letter dated August 24, 1998, from the attorney general's office to the prosecutor's office ("AG Letter") Marcolini Decl., Exh. 20. A local ordinance would be insufficient to preempt the terms of the state statute. *Id.; see also* UCP Letter–3.

Following this series of correspondence, on October 2, 1995, the Township's chief of police issued a directive limiting the ability of the SLEOs to accept private jobs-in-blue. *See* DO:95–066, Marcolini Decl., Exh. 21. The directive ordered that "effective immediately, Special Police Officers are prohibited from working any Jobs–In–Blue for private employers where they are not paid through the Township and placed in an on duty status by the Chief of Police." *Id.*

## D. After the Jobs–in–Blue Directive

Following this directive issued by the chief of police, the plaintiffs continued to serve as SLEOs and to perform their town duty requirements until their appointments terminated on December 31, 1995. The plaintiffs were reappointed by resolution of the Township as SLEOs for calendar years 1996 and 1997. *See* Marcolini Decl., Exh. 8. Of the fifteen SLEOs appointed for calendar year 1997, twelve were the original plaintiffs in this action (as noted above, one plaintiff from this group has since withdrawn). *Id.*

On April 21, 1997, one of the plaintiffs, Ross Todaro, sent a letter to the Township's mayor on the letterhead of Local 7, the unrecognized bargaining group representing the SLEOs. Mr. Todaro requested a meeting with the mayor to "continue our discussion regarding the concerns of our members who serve as Special Police Officers in the Township of Union." Marcolini Decl., Exh. 30. After consultation with the official union, Local 69, the mayor determined not to meet with Local 7, and responded to Mr. Todaro in

a letter dated April 30, 1997. *See* Marcolini Decl., Exh. 33.

Later that year, the chief of police submitted a memorandum to the Township in which he reported on the status of the SLEO program. Marcolini Decl., Exh. 34. In the memorandum, dated December 13, 1997, the chief of police reported that SLEOs actually performed less than 64% of their required town duty hours, and that SLEOs responded less than on 50% of the occasions that the police department called for assistance at special township events. After balancing the cost of training and supervising the SLEOs against the benefits that resulted from the SLEO program, the chief of police wrote that he believed the continued use of SLEOs to be "unwise and not cost effective." He concluded by recommending that the Township increase its auxiliary police force and not appoint any SLEOs for 1998. *Id.*

The Township concurred with the recommendation of the chief of police and decided not to appoint any SLEOs for calendar year 1998. All 1997 SLEOs were informed by a letter dated January 2, 1998, sent by the chief of police, that their terms as SLEO had expired and the Township had not reappointed them for 1998. Marcolini Decl., Exh. 35.

### PRELIMINARY MATTERS

#### A. Procedural History

On October 1, 1997, plaintiffs filed a one-count complaint in this action, alleging defendant's failure to comply with 29 U.S.C. § 206. The defendant was served with the complaint on October 7, 1997. On January 21, 1998, plaintiffs filed an amended complaint, adding a second count alleging retaliatory termination in light of the Township's failure to reappoint them as SLEOs for 1998. On February 6, 1998, defendant obtained a 15–day extension of the time within which to file an answer. Defendant filed its answer on February 23, 1998.

On or about July 17, 1998, plaintiffs filed a motion for summary judgment on the first count of the amended complaint, and defendant filed a motion for summary judgment on both counts of the amended complaint.

Plaintiffs argue that the Township is both collaterally and judicially estopped from denying that the SLEOs are joint employees of the Township and the private subscribers because this issue was determined in PERC–1. Plaintiffs then argue that they are entitled to summary judgment because as a matter of law, plaintiffs constituted employees when performing town duty after October 2, 1995, and therefore are entitled to receive minimum wages for that period, pursuant to the FLSA.

Defendant counters by arguing that it is entitled to summary judgment because plaintiffs constituted volunteers while performing town duty and, as a result, are not protected under the FLSA. Second, defendant argues that the performance of any jobs-in-blue by the SLEOs was in violation of the New Jersey Private Detective Act and was therefore void ab initio, and could not constitute reliance for the plaintiffs' decisions to become SLEOs. Third, defendant argues that it cannot be liable for retaliatory discharge because plaintiffs were volunteers, not employees, and furthermore were only appointed for one-year terms. Fourth, defendant asserts that plaintiffs have sustained no damages and therefore do not have a viable cause of action. Finally, defendants conclude by arguing that plaintiffs' claims are barred by res judicata, collateral estoppel, and the entire controversy doctrine.

#### B. Jurisdiction

This Court has original jurisdiction over claims brought under the FLSA, 29 U.S.C. § 201 et seq. *See* 28 U.S.C. § 1331.

#### C. Standard for summary judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment has the burden of demonstrating that there is no genuine issue as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317,

322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has properly made and supported its summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). If the adverse party fails to respond with a showing that there is a genuine issue for trial, "summary judgment, if appropriate, shall be entered against the adverse party." *Id.* In making this determination, the Court must draw all reasonable inferences in favor of the non-moving party. *See National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1581 (3d Cir.1992).

The Court's function at the summary judgment stage of litigation is to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is genuine if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *See id.; Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993). Absent evidence sufficient to permit a jury to return a verdict for the non-moving party, there is no issue for trial, and summary judgment must be granted. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DEFENSES

Before turning to the substantive arguments of plaintiffs and defendant, the Court will dispose of certain defenses raised by the defendant, which, if valid, would preclude further legal inquiry. These defenses are the doctrines of res judicata, collateral estoppel, and entire controversy. The Court will first examine the jurisdiction of the PERC and the preclusive effects of its decisions on subsequent adjudication, and will then proceed with an analysis of each of the three defenses.

## A. PERC Jurisdiction

The PERC is an administrative body established within the New Jersey Division of Public Employment Relations that has the authority and duty to implement and administer the provisions of the New Jersey Employer–Employee Relations Act, N.J.S.A. § 34:13A–1 et seq. Among the specific functions of the PERC are: (1) to issue complaints alleging unfair labor relations practices; (2) "to determine whether a matter in dispute is within the scope of collective negotiations"; and (3) "to regulate the conduct of representative elections." *See* N.J.S.A. 34:13A–5.4. Additionally, the PERC has the duty of ruling on representation petitions, which may be filed by any public employee(s) or organization claiming to be the exclusive representative of a group of public employees, or by a public employer. *See* N.J.A.C. 19:11–1.1.

After a representation petition is filed, the Director of Representation, one of the officers serving on the PERC, makes findings of fact regarding the petition. N.J.A.C. 19:11–6.1, 6.3(a). The Director then issues a report to the full PERC, including a recommendation as to whether or not the petition should be granted. N.J.A.C. 19:11–7.1. The PERC may adopt, reject, or modify the report of the Director of Representation. N.J.A.C. 19:11–7.4(a). If no objections are filed, the recommendation of the Director of Representation becomes a final decision 45 days after the report is issued. N.J.A.C. 19:11–7.4(c). An aggrieved party may file a request for review with the PERC within 10 days of the service of the final decision. N.J.A.C. 19:11–8.1(a).

Defendant has cited to no authority in support of its contention that the PERC has jurisdiction over FLSA claims, and the Court has been unable to locate any case law that specifically addresses this issue. However, cases that have discussed PERC jurisdiction in other contexts suggest that the PERC has jurisdiction to interpret and apply laws outside the Act only to the extent that those laws are necessary to resolve a statutory claim under the Act. *See, e.g., Kelly v. Borough of Sayreville,* 107 F.3d 1073, 1078 (3d Cir.1997) (McKee, C.J., concurring); *Hunterdon Cent. High Sch. Bd. of Educ. v. Hunter-*

*don Cent. High Sch. Teachers' Ass'n,* 174 N.J.Super. 468, 473–74, 416 A.2d 980 (App. Div.1980) (PERC may apply federal constitutional law when necessary to resolve a claim made under the Act), *aff'd,* 86 N.J. 43, 429 A.2d 354 (1981); *Bernards Township Bd. of Educ. v. Bernards Township Educ. Ass'n,* 79 N.J. 311, 316–17, 399 A.2d 620 (1979) (*"In carrying out its duties,* PERC will at times be required to interpret statutes other than the Employer–Employee Relations Act." (emphasis added)).

**B. Preclusive Effect of Administrative Decisions Generally**

 When a court is evaluating the preclusive effect of a prior decision under the doctrines of claim preclusion, issue preclusion, and entire controversy, "[a]s a general rule, an adjudicative decision of an administrative agency 'should be accorded the same finality that is accorded the judgment of a court.'" *Bressman v. Gash,* 131 N.J. 517, 526, 621 A.2d 476 (1993) (quoting Restatement (Second) of Judgments § 83, comment b (1982)). When a state agency, "'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's court." *University of Tennessee v. Elliott,* 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (quoting *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)).

 Even when a federal court is determining a federal cause of action, it is bound by the preclusive effect of decisions made by state adjudicative bodies. *See* 28 U.S.C. § 1738; *Rycoline Prods., Inc. v. C & W Unlimited,* 109 F.3d 883, 887 (3d Cir.1997) (discussing preclusive effect of entire controversy doctrine); *Peduto v. City of North Wildwood,* 878 F.2d 725, 728 (3d Cir.1989) (addressing claim and issue preclusion).

**C. Claim Preclusion**

Defendant argues that under the doctrine of res judicata, or claim preclusion, plaintiffs' present cause of action is precluded by the PERC–1 and PERC–2 decisions.

 In the interests of finality, judicial efficiency, and fairness to the parties, claim preclusion serves to prevent relitigation of a cause of action that has already been adjudicated in a prior proceeding. *See Sibert v. Phelan,* 901 F.Supp. 183, 186 (D.N.J.1995). To determine whether an action should be precluded, a court must look to the preclusion law of the jurisdiction where the first action occurred. *Id.*

 In New Jersey, claim preclusion applies to bar subsequent litigation when a substantially similar cause of action has already been litigated if "(1) the judgment in the first action is valid, final, and on the merits; (2) the parties in both actions are the same or are in privity with each other; and (3) the claims in the second action ... arise from the same transaction or occurrence as the claims in the first one." *Id.; see also Watkins v. Resorts Int'l Hotel & Casino, Inc.,* 124 N.J. 398, 411–12, 591 A.2d 592 (1991).

 With regard to the first of the claim preclusion criteria, the Court notes that a dismissal on procedural grounds (such as lack of jurisdiction) is not considered to be a judgment "on the merits" and will not preclude a later action on the same claim. *See Watkins,* 124 N.J. at 415–16, 591 A.2d 592; *Velasquez v. Franz,* 123 N.J. 498, 506, 589 A.2d 143 (1991); Restatement (Second) of Judgments § 20(1)(a). When evaluating the third requirement for claim preclusion, that is, whether claims "arise from the same transaction or occurrence," courts are directed to consider:

(1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at the trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the material facts alleged are the same.

*Jones v. Holvey,* 29 F.3d 828, 830 (3d Cir. 1994); *Culver v. Insurance Co. of North America,* 115 N.J. 451, 461–62, 559 A.2d 400 (1989) (internal citations omitted) (quoting *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 984 (3d Cir.1984)).

■ The Court finds that the first condition for claim preclusion is not satisfied because the PERC–1 and PERC–2 decisions were not made "on the merits." In PERC–1, Local 7 filed a petition seeking authority from the state to represent a group of SLEOs. The Director concluded that when SLEOs performed jobs-in-blue, they constituted joint employees of the Township and the subscribers. As a result of the Director's determination that the SLEOs were not exclusively employees of the state, the PERC lacked a statutory basis for jurisdiction over the representation petition, and the Director dismissed the petition. In PERC–2, the PERC did nothing more than affirm the Director's decision that the PERC lacked jurisdiction over the petition.

In the current litigation, a group of SLEOs have filed a claim under the FLSA seeking compensation from the Township for hours that they spent performing town duty subsequent to October 2, 1995, and reinstatement to their former appointments as SLEOs. Defendant has not persuasively demonstrated why claim preclusion should apply when the first "cause of action" (if the representation petition can be described as such) was dismissed on jurisdictional grounds.

■ The Court will assume, *arguendo,* that the second requirement for claim preclusion is met—that the current group of plaintiffs is identical to or in privity with Local 7. However, the Court finds that the third requirement for claim preclusion has not been satisfied because the two causes of action did not "arise from the same transaction or occurrence." Utilizing the first two factors specified in *Jones* and *Culver,* the "cause of action" involved in PERC–1 and the causes of action specified in plaintiffs' current amended complaint simply do not demonstrate sufficient similarity in terms of the "acts complained of," "demand for relief," and "theory of recovery" to justify defen-

dant's assertion they "arise from the same transaction or occurrence."

In PERC–1, for instance, even construing the phrase broadly, the only "act complained of" was the lack of formally recognized representation for the SLEOs. The "relief" demanded was the right to represent the SLEOs, and the "theory of recovery" was that Local 7 had sufficient support to serve as the official and exclusive bargaining representative for the SLEOs, who were asserted to be a group of public employees. In the instant case, the "acts complained of" are defendant's alleged failure to pay plaintiffs in accordance with the FLSA, and defendant's alleged retaliatory termination of plaintiffs for filing their original complaint. The relief demanded is primarily monetary, although plaintiffs also seek reinstatement to their positions as SLEOs. Plaintiffs' theory of recovery is that the SLEOs are entitled to minimum wage compensation because they constituted employees after October 2, 1995. Res judicata should not serve to bar to the instant litigation when the required areas of commonality reflect this much disparity.

Because the PERC–1 and PERC–2 decisions were not decisions "on the merits," and because plaintiffs' second cause of action does not "arise from the same transaction or occurrence" as the PERC–1 and PERC–2 decisions, the Court finds that plaintiffs' claim is not barred by res judicata. The Court declines to grant summary judgment in favor of defendant on the grounds of claim preclusion.

## D. Issue Preclusion

■ Issue preclusion, or collateral estoppel, "precludes the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted." *Electro–Miniatures Corp. v. Wendon Co.,* 889 F.2d 41, 44 (3d Cir.1989) (quoting *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986).

■ Under New Jersey law, in order for an issue to be collaterally estopped, a court must find that "(1) the prior court actually litigated and determined the issue; (2) the prior court's judgment was valid and

final; (3) the determination of that issue was essential to the prior court's judgment; (4) the parties in the subsequent action are the same as those in the prior one." *Peduto,* 878 F.2d at 727 n. 1 (citing *City of Plainfield v. Public Serv. Elec. & Gas Co.,* 82 N.J. 245, 258, 412 A.2d 759 (1980)). In order to be precluded, an issue must have been "distinctly put in issue and directly determined adversely to the party against which estoppel is asserted." *Sibert,* 901 F.Supp. at 186 (citations omitted).

Many courts have emphasized that the quest for judicial efficiency and finality served by issue preclusion must not contravene the ultimate goal of effecting justice. In addition to determining that the conditions outlined above are satisfied, a court must ascertain "perhaps the most important requirement of all: that the matter was fairly litigated previously." *Wood v. Garden State Paper Co., Inc.,* 577 F.Supp. 632, 635 (D.N.J. 1983). "The doctrine of issue preclusion is an equitable doctrine and will only be applied when it is fair to do so." *State of New Jersey, Dept. of Law & Public Safety, Div. of Gaming Enforcement v. Gonzalez,* 273 N.J.Super. 239, 246, 641 A.2d 1060 (App.Div. 1994), *aff'd,* 142 N.J. 618, 667 A.2d 684 (1995). "A central tenet of issue preclusion directs that collateral estoppel bars reconsideration of only those issues that the parties had a full and fair opportunity to litigate." *In re Braen,* 900 F.2d 621, 628 (3d Cir.1990), *cert. denied, Braen v. Laganella,* 498 U.S. 1066, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991).

The doctrine of issue preclusion is inapplicable when the issue sought to be precluded is actually a question of law: "The ability of a court to readdress previously adjudicated issues may under appropriate circumstances be exercised despite narrow confines of issue preclusion or res judicata .... especially ... where ... the issue is purely one of law and a new determination is warranted to avoid inequitable administration of the law." *City of Plainfield v. Public Service Elec. & Gas Co.,* 82 N.J. 245, 258–59, 412 A.2d 759 (1980).

The Third Circuit has recognized that an exception to issue preclusion doctrine

exists where the issue is an "unmixed question of law." *See Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1237 (3d Cir.1995). This exception applies only where the previously determined issue is one of law, and "either (1) 'the two actions involve claims that are substantially unrelated' or (2) 'a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws.'" *Id.* (quoting Restatement (Second) of Judgments § 28(2)). Cases are "substantially related" where "'the same general legal rules govern both cases and ... the facts of both cases are indistinguishable as measured by those rules.'" *Id.* (quoting Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4425 (1981)).

Defendant asserts that the issue of plaintiffs' status as volunteers or employees while performing town duty has already been determined in PERC–1 and PERC–2 and therefore is precluded from relitigation. Because this issue would control the outcome of the instant litigation, defendant argues that plaintiffs' claims are barred by issue preclusion.

After close review of the PERC–1 decision, this Court has concluded that preclusive effect should not be given to the Director's "conclusion" that SLEOs constituted volunteers when performing town duty. The only definitive determination reached in PERC–1 is that when SLEOs performed jobs-in-blue, their status was that of joint employees of the Township and the subscribers, and therefore, the PERC did not have jurisdiction over the petition of an organization seeking to represent the SLEOs.

Although the PERC–2 decision states in no uncertain terms that the Director of Representation "found that the only Township work the special police do is uncompensated 'town duty' and thus they are volunteers and not public employees," the Court is not as sanguine that this interpretation of PERC–1 is entirely accurate.

The PERC–2 decision is based solely on the following excerpt from PERC–1:

The Township argues that the only work the specials do for the Township is town duty which is performed without pay. *Accordingly the specials are volunteers and not public employees.* Regardless of the status of special police while doing town duty work, the specials cannot be considered volunteers while they are doing jobs-in-blue work—for which they are being paid.

(emphasis added.) This is the only sentence in the PERC–1 decision that addresses the SLEOs' status as volunteers.

The Court finds this excerpt from PERC–1 to be ambiguous at best. The emphasized sentence may constitute an assertion by the PERC, or it may simply be a statement of the conclusion that would follow from the Township's argument. The Director glosses over this distinction in the next sentence, which begins with the word "regardless." The use of this word signals that the status of the SLEOs while performing town duty was irrelevant to the Director's ultimate finding—that the PERC lacked jurisdiction over the representation petition because the status of the SLEOs while performing jobs-in-blue disqualified them as full "public employees."

This single, ambiguous, unsupported statement in the PERC–1 decision, made without reference to any statutory or case law definitions of "employee" and "volunteer," is inadequate to preclude further inquiry into the status of the SLEOs while performing town duty. If the statement actually constituted a ruling by the PERC, it was made without any legal substantiation or analysis whatsoever.

Therefore, two of the four elements of issue preclusion outlined in *Peduto* have not been satisfied: the prior court did not "actually litigate and determine" the issue; and the determination of the issue was not "essential to the prior court's judgment."

▇ In addition, the Court is satisfied that the status of the SLEOs as volunteers or employees satisfies the definition of an unmixed question of law specified in *Burlington* and is therefore excepted from the doctrine of issue preclusion. As noted below, the determination of whether a person qualifies as an employee or a volunteer has uniformly been held to be a question of law for the court to determine. Additionally, the claims in PERC–1 and PERC–2 are not "substantially related" to the present litigation. The "same general legal rules" do not govern the PERC decisions, which involved a question of state law as to the jurisdiction of the PERC to decide Local 7's representation petition, and the plaintiffs' current amended complaint, asserting a violation of the FLSA minimum wage requirements.

The Court finds that the determination of plaintiffs' status as volunteers or employees when performing town duty is not barred by issue preclusion. The Court does not dispute that it is bound by findings of fact made by the Director in the PERC–1 decision; however, those findings of fact do not compel the Court to reach the same legal conclusions made in PERC–1. The Court will not grant defendant's motion for summary judgment on collateral estoppel grounds.

### E. Entire Controversy Doctrine

▇ "The entire controversy doctrine seeks to assure that all aspects of a legal dispute occur in a single lawsuit." *Olds v. Donnelly,* 150 N.J. 424, 431, 696 A.2d 633 (1997). To that end, parties are required to unify in one action all claims and defenses arising out of a particular controversy, as well as all parties connected with the controversy. *See id.; Rhodes v. Township of Saddle Brook,* 980 F.Supp. 777, 781–82 (D.N.J. 1997). If such joinder does not occur, further litigation involving the omitted claims or parties will be precluded. *See* N.J. R. of Civil P. 4:30A; *Rhodes,* 980 F.Supp. at 782–83.

▇ Even if a related claim arises during the pendency of litigation, a party is required to "seek leave to file a supplemental pleading thereby submitting to judicial discretion the determination of whether the claim should be joined in that action or reserved for a subsequent suit ...." *McNally v. Providence Washington Ins. Co.,* 304 N.J.Super. 83, 92, 698 A.2d 543 (App.Div. 1997). However, "[i]t is well recognized that the entire controversy doctrine does not bar

related claims which have not arisen or accrued during the pendency of the original action." *Id.* at 94, 698 A.2d 543.

In order for the entire controversy doctrine to apply, there must be "equality of forum, that is, the first forum must have been able to provide all parties with the same full and fair opportunity to litigate the issues and with the same remedial opportunities as the second forum." *Hernandez v. Region Nine Housing Corp.*, 146 N.J. 645, 661, 684 A.2d 1385 (1996) (quoting *Perry v. Tuzzio*, 288 N.J.Super. 223, 230, 672 A.2d 213 (App. Div.1996)).

Defendant asserts that plaintiffs' FLSA claim should have been raised contemporaneously and in the same forum as Local 7's petition for representation filed before the PERC. Plaintiffs argue in response that their claim under the FLSA did not arise until October 2, 1995, and thus could not have been joined with Local 7's petition, which was filed in July 1992. The PERC–1 decision was issued November 7, 1994, and the PERC–2 decision was dated November 28, 1995.

Plaintiffs assert that their claim for minimum wages under the FLSA accrued on October 2, 1995, the day that their eligibility for jobs-in-blue terminated.[2] Plaintiffs' rationale is that prior to that date, their jobs-in-blue eligibility itself constituted compensation for the performance of town duty. Plaintiffs argue that the elimination of this "compensation" was the act that created their entitlement to wage protection under the FLSA.

Given the way in which plaintiffs have stated their cause of action and framed their arguments, the Court must concur with plaintiffs' assertion that the entire controversy doctrine does not bar their claims because those claims had not yet accrued at the time of the PERC–1 decision.[3]

Moreover, the Court is not convinced that the PERC would have had the authority under state statute to exercise jurisdiction over plaintiffs' FLSA claims, even if plaintiffs had asserted them before the PERC. *See* N.J.S.A. § 34:13A–1 et seq. Defendant has cited to no cases in which the PERC has determined minimum wage FLSA claims. Defendant relies heavily on one case in which this Court concluded that the entire controversy doctrine barred a plaintiff from raising certain claims under 42 U.S.C. § 1983 in federal court after the plaintiff had already filed a state unfair labor practice claim and a federal First Amendment claim with the PERC. *Kelly v. Borough of Sayreville*, 927 F.Supp. 797, 801, 805 (D.N.J.1996), *aff'd*, 107 F.3d 1073 (3d Cir.1997).

Defendant's reliance on *Kelly* is misplaced in light of the subsequent history of the case. Although the Third Circuit affirmed this Court's dismissal of the complaint, it did so because it agreed with the Court's alternative holding that the plaintiff failed to state a claim upon which relief could be granted. *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1078 (3d Cir.1997). The Court's entire controversy analysis, however, was called into question in a concurring opinion, which focused in particular on the limits on PERC's jurisdiction. *Id.* at 1079 (McKee, C.J., concurring). The concurrence noted that the federal claims raised by the plaintiff had not been "adjudicated in the PERC proceeding [and][t]herefore, [the plaintiff's] action in federal district court should not have become ensnared in the tentacles of the entire controversy doctrine." *Id.* at 1080 (McKee, C.J., concurring).

For the above reasons, the Court declines to grant summary judgment in favor of defendant on the grounds of the entire controversy doctrine.

## FLSA STANDARDS

The Court will now proceed to address the substantive questions posed by the parties'

---

**2.** Plaintiffs' retaliatory termination claim accrued as of the date that plaintiffs' appointments as SLEOs lapsed, or January 1, 1998.

**3.** Although plaintiffs' minimum wage claim had accrued at the time the PERC–2 decision was issued, the Court finds that plaintiffs could not

reasonably be expected to raise FLSA claims for the first time before an administrative body of limited jurisdiction as it considered on appeal the decision in PERC–1 that the PERC lacked jurisdiction over Local 7's representation petition.

summary judgment motions. In accordance with the summary judgment standard, the Court must determine whether any genuine issue of material fact exists sufficient to defeat 1) plaintiffs' assertion that they qualified as employees when performing town duty subsequent to October 2, 1995,[4] and are thus entitled to the minimum wage of the FLSA, and 2) defendant's assertion that plaintiffs constituted "volunteers" when performing town duty subsequent to October 2, 1995, and therefore do not fall under the provisions of the FLSA.

Additionally, the Court must determine whether any genuine issue of material fact exists sufficient to defeat defendant's motion for summary judgment on the retaliatory termination count of plaintiffs' amended complaint.

## A. Definition of "Employee"

The FLSA requires that "[e]very employer shall pay to each of his employees who in any workweek ... is employed in an enterprise engaged in commerce or the production of goods for commerce" the minimum hourly wages specified in the statute. 29 U.S.C. § 206(a). Because the FLSA serves a remedial purpose, it "must not be interpreted or applied in a narrow, grudging manner." *Tennessee Coal, Iron & R.R. Co. v. Sloss Red Ore Local No. 121,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944).

The determination of whether an individual should be classified as a volunteer or as an employee for purposes of the FLSA has been held to be a question of law for the determination of the court. *See Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1292 (3d Cir.1991); *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376, 1381 n. 2 (3d Cir.), *cert. denied, DialAmerica Marketing, Inc. v. Brock,* 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 571 (10th Cir.1994); *Rodriguez v. Township of Holi-*

*day Lakes,* 866 F.Supp. 1012, 1017–18 (S.D.Tex.1994).

In a series of what are often noted to be circular and less-than-helpful definitions, the FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency ...." 29 U.S.C. § 203(d). "Employ" means "to suffer or permit to work." 29 U.S.C. § 203(g). "Employee" is defined as "any individual employed by an employer" or "any individual employed by a State, political subdivision of a state, or an interstate governmental agency." 29 U.S.C. § 203(e)(1); 203(e)(2)(C).

The FLSA specifically excludes from the definition of "employee" individuals who provide services to a governmental entity under certain circumstances:

> The term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State ... if—
>
> > (I) the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and
> >
> > (ii) such services are not the same type of services which the individual is employed to perform for such public agency.

29 U.S.C. § 203(e)(4)(A).

In the absence of more precise statutory or regulatory definitions, various court decisions have attempted to clarify the application of the FLSA. For instance, "work" and "employment" are given their "ordinary" meaning, that is, "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal,* 321 U.S. at 598, 64 S.Ct. 698.

When evaluating the employer-employee relationship, courts interpreting the

---

4. In their brief opposing defendant's motion, plaintiffs have conceded that the applicable statute of limitations under the FLSA bars recovery of wages more than two years prior to the filing of the original complaint on October 1, 1997.

*See* 29 U.S.C. § 255(a). In fact, plaintiffs argue that their cause of action did not accrue until October 2, 1995, when plaintiffs first became ineligible for jobs-in-blue.

FLSA have looked for guidance to the standards applied in the application of social security and labor relations laws. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 723–24, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). An "economic realities" test is used as the basis for determining an individual's employment status: "[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); *see also Tony & Susan Alamo Fdn. v. Secretary of Labor*, 471 U.S. 290, 301, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985).

Several factors have been identified to be considered when determining whether an employer/employee relationship exists under the economic realities test:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*DialAmerica*, 757 F.2d at 1382 (quoting *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir.1981)); *see also United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

██ A further consideration in the economic realities test is a determination as to whether, "as a matter of economic reality, the individuals are 'dependent upon the business to which they render service.'" *DialAmerica*, 757 F.2d at 1382. "Dependent," as used here, does not mean "whether the workers at issue depend on the money they earn for obtaining the necessities of life . . . . [but r]ather . . . whether the workers are dependent on a particular business or organization for their continued employment" or are "in a position to offer their services to many different businesses or organizations." *Id.* at 1385–86.

██ Courts have repeatedly emphasized that this list is neither definitive nor exclusive. The presence or absence of any of the factors is not in and of itself dispositive. *See, e.g., DialAmerica*, 757 F.2d at 1382; *Selker Bros.*, 949 F.2d at 1293. Above all, the analysis of whether an individual is an employee "does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." *Rutherford*, 331 U.S. at 730, 67 S.Ct. 1473; *see also DialAmerica*, 757 F.2d at 1382.

██ Moreover, it is important to note that the factors outlined above have not been developed for the purpose of distinguishing employees from volunteers, but rather are intended "to measure and balance the competing economic realities involved in an employee/independent contractor distinction." *Rodriguez*, 866 F.Supp. at 1020. The economic realities test "presupposes a real economic exchange between the parties," and therefore is not as useful when attempting to distinguish volunteers from employees, where "there is no economic relation to measure." *Id.* at 1020; *see also Krause v. Cherry Hill Fire Dist. 13*, 969 F.Supp. 270, 274–75 (D.N.J.1997) (noting that economic realities test "offers little guidance" when attempting to distinguish employees from volunteers).

**B. Definition of "Volunteer"**

The Supreme Court has defined a "volunteer" to be "an individual who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit." *Alamo Fdn.*, 471 U.S. at 295, 105 S.Ct. 1953. The Court has also noted that the FLSA "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152, 67 S.Ct. 639, 91 L.Ed. 809 (1947) (concluding that participation in railroad training program did not constitute employment under FLSA where primary benefit redounded to trainees).

Although the FLSA does not define "volunteer," such a definition is provided in certain regulations promulgated by the Department of Labor to aid in the interpretation and application of the FLSA. The applicable regulation defines "volunteer" as follows:

(a) An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours....

(b) Congress did not intend to discourage or impede volunteer activities undertaken for civic, charitable, or humanitarian purposes, but expressed its wish to prevent any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to "volunteer" their services.

(c) Individuals shall be considered volunteers only where their services are offered freely and without pressure or coercion, direct or implied, from an employer.

(d) An individual shall not be considered a volunteer if the individual is otherwise employed by the same public agency to perform the same type of services as those for which the individual proposes to volunteer.

29 C.F.R. § 553.101.

Another regulation expands on this definition and supplies several examples of the kinds of activities that might be pursued by volunteers:

(a) Individuals who are not employed in any capacity by State or local government agencies often donate hours of service to a public agency for civic or humanitarian reasons. Such individuals are considered volunteers and not employees of such public agencies if their hours of service are provided with no promise, expectation, or receipt of compensation for the services rendered, except for reimbursement for expenses, reasonable benefits, and nominal fees, or a combination thereof....

(b) Examples of services which might be performed on a volunteer basis when so motivated include helping out in a sheltered [sic] workshop or providing personal services to the sick or the elderly in hospitals or nursing homes; assisting in a school library or cafeteria; or driving a school bus to carry a football team or band on a trip. Similarly, individuals may volunteer as firefighters or auxiliary police, or volunteer to perform such tasks as working with retarded or handicapped children or disadvantaged youth ....

29 C.F.R. § 553.104.

## ANALYSIS OF PLAINTIFFS' STATUS AS EMPLOYEES OR VOLUNTEERS

### A. Do Plaintiffs Constitute Employees?

Plaintiffs argue that they constitute employees as a matter of law and therefore are entitled to summary judgment on the first count of their amended complaint. The Court will use the available standards to determine whether any genuine issue of material fact exists as to whether plaintiffs constituted employees under the FLSA when performing town duty subsequent to October 2, 1995. The Court must draw all inferences in favor of defendant when evaluating plaintiffs' motion for summary judgment.

At the outset, the Court observes that the effectiveness of the FLSA, as with any schema designed to classify individuals into distinct categories, is dependent upon the specificity of the definitions it employs, and therefore may be limited by the imprecision inherent in its system of classifications.

The FLSA was intended to protect workers from abuse by requiring that persons who qualified as "employees" be paid a specified minimum wage. Guided by the definitions provided in the FLSA and related regulations, courts have worked to formulate rules that successfully distinguish "employees" from other workers, such as "independent contractors," "trainees," or "volunteers." As disputes have arisen over the years involving employee versus independent contractor status, courts applying the FLSA have developed legal standards to assist in distinguishing these two categories of workers, resulting in the multifactor economic realities test outlined above. It appears that conflicts regarding employee versus volunteer status arise far less frequently, because many fewer cases have addressed the distinc-

tions between these two categories of workers. As a result, courts have less guidance when faced with the need to make such distinctions.

The Court indicates its accord with the *Krause* and *Rodriguez* decisions that the economic realities test is of limited use when attempting to distinguish employees from volunteers. As in *Krause*, however, the Court will examine each factor to determine whether it contributes to the determination of plaintiffs' status.

The first factor, the "right to control the manner in which the work is to be performed," is of little utility in this case. This factor is not helpful in distinguishing employees from volunteers because there is no necessary relation between degree of control exercised over an individual and the status of that individual. A volunteer may be given substantial freedom in performing certain tasks, while another may be supervised closely; but the same applies to an employee as well. *See Krause*, 969 F.Supp. at 275.

The second and third factors, an individual's "opportunity for profit or loss" and "investment in materials and equipment," while meaningful in the context of distinguishing employees from independent contractors, have little relevance to distinguishing employees from volunteers. *See id.* Similarly, the fourth factor, the level of "special skill" required for the service rendered, does not necessarily correlate with whether the person is a volunteer or an employee, for a volunteer may be either more or less skilled than an employee counterpart without any necessary effect on his or her status as a volunteer. *See id.*

The fifth factor, the "permanence of the relationship" between plaintiffs and defendant, is also unhelpful in distinguishing employees from volunteers. The facts indicate that plaintiffs served as SLEOs for periods of time ranging from nine to twenty-seven years; however, plaintiffs have not adequately explained why this makes them any more likely to constitute "employees" rather than "volunteers." Many volunteers have long-standing commitments to the organizations that they serve, while many employees work for short periods of a year or even less. The volunteer/employee distinction lies outside mere longevity of relationship. *But cf. id.* (finding permanency of relationship to be indicative of employee status).

The Court finds that the sixth factor of the test, "whether the service rendered is an integral part of the alleged employer's business," can be a relevant factor in the distinction between employee and volunteer. In *DialAmerica*, "integral part" was defined as "relat[ing] not to the percentage of total work done by the workers at issue, but to the nature of the work performed by the workers: does that work constitute an 'essential part' of the alleged employer's business?" *DialAmerica*, 757 F.2d at 1385.

As a general rule (though the Court notes preemptively that exceptions surely exist to this rule), employees constitute a more integral part of a business than volunteers do. When someone's services are essential to the operation of a business, that person is more often an employee of the business than a volunteer. A volunteer, on the other hand, usually fills an adjunct or supplementary role in the operation of the business. Although the services provided by volunteers is of high value, an employee is more likely to be indispensable to a business than a volunteer is. A volunteer, after all, serves at his or her own whim. If a particular volunteer were vital to the operation of a business, the business would be likely to attempt to ensure the continued performance of the volunteer by forming a more permanent (and compensatory) bond between them. Furthermore, if the volunteer were vital to the business, the volunteer would be likely to exploit his or her importance to secure a wage from the business.

In this case, in order to satisfy the requirements to be SLEOs, plaintiffs were obligated to perform four hours of town duty each week for defendant. Plaintiffs argue that because they were performing "police protection and safety services" to defendant, they were "clearly" an integral part of the business of defendant, a municipal police department.

However, defendant terminated the SLEO program completely as of December 31,

1997, due to inefficiencies and problems cited in the police chief's December 13, 1997, memorandum to the Township. Marcolini Decl., Exh. 34. The Court is perplexed as to how plaintiffs' services could form an "integral" or "essential" of defendant's business in view of the fact that defendant managed to terminate the SLEO program entirely without any apparent negative effect on the Township's police force. Indeed, the chief of police recommended the termination of the program because, in his opinion, the SLEOs were "of little use to the police department." *Id.*

The fact that the entire SLEO program could be summarily discontinued without adversely affecting the operation of defendant's police department leads the Court to conclude that the SLEOs did not constitute an "integral" part of defendant's business.

The final consideration outlined in *DialAmerica* is whether plaintiffs are "dependent upon the business to which they render service. . . . [that is] whether the workers are dependent on a particular business or organization for their continued employment." *DialAmerica,* 757 F.2d at 1385. A worker "with numerous options for employment in the particular field at issue" is therefore "not economically dependent on a single employer." *Krause,* 969 F.Supp. at 275.

The Court reiterates its frustration with attempting to apply this employee/independent contractor distinction when trying to distinguish employees from volunteers. Of all the factors involved in the economic realities test, the Court is most confounded by how to apply this one. The very crux of this case is *whether* any employment relationship should be held to exist between plaintiffs and defendant. When the very issue being analyzed is whether or not plaintiffs are "employed," how can it be useful (or possible) for the Court to engage in a determination of whether plaintiffs are "dependent" on defendant for "their continued employment"?

Rather than get pulled in by the dizzying centripetal force of a circular argument, the Court will decline to analyze this factor further in this context. The Court does take note of the fact that all eleven of the plaintiffs have outside full-time, paid employment, and had such employment during the time

that they performed SLEO town duty and jobs-in-blue.

Plaintiffs advance a confusing and tenuous argument that because the PERC–1 decision found them to be joint employees of the Township and the jobs-in-blue subscribers, the Township constituted an employer of plaintiffs prior to October 2, 1995, when the jobs-in-blue eligibility ended. Plaintiffs contend that the termination of the jobs-in-blue eligibility was a unilateral attempt on defendant's part to change plaintiffs' status from employees to volunteers. Such a transition is specifically prohibited in *Krause. See Krause,* 969 F.Supp. at 278.

Plaintiffs start from the assumption that prior to October 2, 1995, they constituted employees while performing town duty because they received "compensation" in the form of their eligibility for jobs-in-blue. Plaintiffs then argue that after the elimination of their jobs-in-blue eligibility on October 2, 1995, plaintiffs were no longer employees because they were no longer receiving "compensation;" as a result, plaintiffs must be volunteers. Therefore, plaintiffs argue, when the Township terminated the SLEOs' eligibility for jobs-in-blue, it unilaterally converted plaintiffs' status from employees to volunteers in violation of *Krause.*

The Court is unpersuaded by this cumbersome argument. First, the Court notes that although plaintiffs were quick to advance the theory that they are not collaterally estopped from challenging PERC–1's finding that they are "volunteers," plaintiffs conveniently ignore that the question of whether they are "employees" presents the same unmixed question of law for this Court to decide. Plaintiffs may not deny defendant the benefit of collateral estoppel only to seek it for themselves.

Second, plaintiffs repeatedly blur the distinction between the two components of their role as SLEOs, namely, their status when performing town duty and their status when performing jobs-in-blue. The only issue before the Court relevant to plaintiffs' claim for minimum wages under the FLSA is whether plaintiffs constituted volunteers or employees when performing *town duty* subsequent to

October 2, 1995. The Court takes note of the factual determinations contained in the PERC-1 decision, but is not bound by the legal conclusion in PERC-1 that the SLEOs constituted joint employees of the state and the subscribers when performing jobs-in-blue.

Although the court in *Krause* determined that the plaintiffs constituted employees rather than volunteers, that case is factually distinguishable from the current case before the Court. *Krause* involved a township that reduced the rate of pay for certain firefighters working overnight shifts from a range of $5.05–$9.00 per hour (an amount that satisfied the minimum wage provisions of the FLSA) to a rate of $20.00 per eight-hour shift (a rate below the applicable minimum wage). *Krause*, 969 F.Supp. at 272. The court granted the firefighters' summary judgment motion, holding that plaintiffs constituted employees and not volunteers for purposes of the FLSA. *Id.* at 278.

Unlike the instant plaintiffs, when the firefighters in *Krause* began their association with the township, they were in an employment relationship that satisfied the requirements of the FLSA and defeated the definition of "volunteer": they expected and received actual compensation (satisfying the minimum wage laws) for services rendered. In the case before the Court, plaintiffs never received or had any expectation of receiving financial compensation for performing town duty. Unlike the court in *Krause*, the Court has concluded that it cannot use the available guidelines and standards defining "employee" to determine whether or not plaintiffs constituted employees while performing town duty.

 In summary, after evaluating the arguments of the parties and analyzing and applying the different facets of the economic realities test, the Court is unable to determine for purposes of plaintiffs' summary judgment motion whether or not plaintiffs constituted employees under the FLSA when performing town duty. The Court finds the economic realities test to be ineffectual in the context of distinguishing employees from volunteers and notes the need for implementing more useful standards to be used in this type of situation.

In the absence of such standards, the Court is reluctant to develop or impose its own test.[5] For the above reasons, the Court will deny plaintiffs' motion for summary judgment on count one of the amended complaint.

## B. Do Plaintiffs Constitute Volunteers?

Defendant argues that plaintiffs constitute volunteers as a matter of law and thus defendant is entitled to summary judgment on both counts of the amended complaint. The Court will now address defendant's argument and determine whether plaintiffs qualify as "volunteers" under the FLSA and applicable regulations and case law. Again, the Court will only consider plaintiffs' status when performing town duty subsequent to October 2, 1995, and, in accordance with the summary judgment standard, will draw all inferences in favor of plaintiffs as the non-moving party.

As noted in *Krause*, in order to qualify as a "volunteer" under the C.F.R. definition, an individual must satisfy two requirements: the individual must be performing services "for civic, charitable, or humanitarian reasons," and the individual must be providing those services "without promise, expectation, or receipt of compensation for services rendered." *See* 29 C.F.R. § 553.101(a); *Krause*, 969 F.Supp. at 276.

Examining the second factor first, the Court finds as a matter of law that plaintiffs performed their town duty functions "without promise, expectation, or receipt of compensation" for those services rendered. The SPR & R clearly specifies that SLEOs shall "receive[ ] no compensation" for town duty functions. Furthermore, plaintiffs, who have served as SLEOs for lengths of time ranging from five to twenty-seven years, appear at no

---

5. The Court would suggest, however, that a starting point might be to formulate a less constrictive and more meaningful definition of "volunteer," as noted *infra* in footnote 8. The party arguing in favor of volunteer status would have the burden of showing that the individual satisfied this new definition of volunteer, and after this test was met, a presumption of "volunteer" status would exist unless the other party offered evidence to rebut the presumption.

time in the past to have raised any claim of entitlement to compensation. Plaintiffs defy logic when they suggest that they have been performing four hours of town duty a week for up to twenty-seven years, considering themselves employees the entire time, but never seeking financial compensation from defendant.[6]

Plaintiffs have failed to provide adequate legal support for their argument that their eligibility for jobs-in-blue constituted "compensation" prior to October 2, 1995.[7] Although compensation has been held to include such material substitutes as "food, shelter, clothing, transportation and medical benefits," plaintiffs have not provided any case law demonstrating that mere eligibility to accept paid employment in and of itself constitutes compensation. *See Alamo Fdn.*, 471 U.S. at 293–94, 105 S.Ct. 1953. The Court is unwilling to extend the commonsense definition of "compensation" to incorporate such intangible benefits as the eligibility to accept potential paid employment.

The Court now turns to the *Krause* requirement that a volunteer must provide services for "civic, charitable, or humanitarian reasons."[8] After October 2, 1995, plaintiffs continued to perform town duty service despite the termination of their eligibility for jobs-in-blue. Plaintiffs asserted in their Answers to Interrogatories that prior to October 2, 1995, they had performed town duty only to be eligible to work jobs-in-blue. However, the record before the Court is silent as to why plaintiffs continued to perform town duty, a task for which they had never received any compensation, after the sole factor that they allege was motivating them to fill that role was eliminated on October 2, 1995.

In the absence of any testimony by the plaintiffs as to their subjective motivations for continuing to perform town duty after October 2, 1995, and in the absence of any persuasive objective data that would provide insight to plaintiffs' subjective motivations, the Court cannot conclude at this time that plaintiffs satisfy the first requirement of the definition of "volunteer." The Court is constrained from granting summary judgment in favor of defendant on the first count of the amended complaint only by the lack of evidence as to this specific material fact. The Court will therefore direct the parties to take

---

6. The Court is also unpersuaded by plaintiffs' argument that they cannot constitute volunteers because they were "coerced" into performing town duty. *See* 29 C.F.R. § 553.101(c). Although the availability of jobs-in-blue may have served as an inducement for plaintiffs to perform town duty prior to the termination of their jobs-in-blue eligibility on October 2, 1995, plaintiffs cannot credibly claim that their continued performance of town duty for more than two years after this date was "coerced" in any way.

7. The Court observes that throughout their briefs, plaintiffs variously and incongruously characterize their jobs-in-blue eligibility as serving as incentive, coercion, or compensation, whenever one characterization is more appropriate to a particular argument they are asserting.

8. The Court suggests that although the applicable definition of "volunteer" crafted by the Department of Labor was obviously intended to be as restrictive as possible in order to protect the interests of workers, the definition may in fact be so narrowly tailored that it actually harms workers more than it helps them. The definition is so restrictive that organizations may be discouraged from making use of valuable volunteer services due to the threat of being held liable for wages. The resulting reluctance to use volunteers may end up depriving would-be volunteers of enriching or beneficial experiences that are not pursued for purely "civic, charitable, or humanitarian reasons."

*See generally* Kelly Jordan, Note, *FLSA Restrictions on Volunteering: The Institutional and Individual Costs in a Changing Economy*, 78 Cornell L.Rev. 302 (1993).

The Court notes that the development of a new, less-restrictive definition of "volunteer" may be called for, especially in the context of services provided to governmental and nonprofit entities. To this end, the Court recommends as a starting point the following alternative definition proposed in a Cornell Law Review article:
(1) the volunteer [undertakes] work [primarily] for the benefit of the volunteer;
(2) the volunteer does not displace regular employees, but works under their close observation;
(3) the volunteer derives a substantial advantage from the work performed;
(4) the volunteer is not necessarily entitled to a job at the completion of his or her volunteer work; and
(5) the employer and the volunteer understand that the volunteers are not entitled to wages for the time spent volunteering.
*Id.* at 332.

whatever limited discovery is necessary to resolve this factual question.

Because a genuine issue of material fact exists regarding plaintiffs' motivations for continuing to perform town duty after October 2, 1995, the Court cannot determine at this time whether plaintiffs constitute volunteers.[9] Defendant's motion for summary judgment as to the first count of plaintiffs' amended complaint will be held in abeyance pending the performance of this limited discovery, which shall be completed within thirty days of the date of the attached Order.

### RETALIATORY TERMINATION CLAIM

Defendant has moved for summary judgment on the second count of plaintiffs' amended complaint, which alleges retaliatory termination in violation of the FLSA.

The FLSA provides that it is unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA] ...." 29 U.S.C. § 215(a)(3).

The analysis of a summary judgment motion on a retaliatory discharge claim is well-settled. *See, e.g., Jalil v. Avdel Corp.*, 873 F.2d 701, (3d Cir.1989) and *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir. 1987) (both cases citing to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *see also Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390 (10th Cir.1997) and *Blackie v. Maine*, 75 F.3d 716 (1st Cir.1996) (addressing retaliatory termination in the context of the FLSA in particular).

The plaintiff must first establish a prima facie case by demonstrating that: "(1) he or she engaged in activity protected by the FLSA; (2) he or she suffered adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection existed between the employee's activity and the employer's adverse action." *Conner*, 121 F.3d at 1394; *see also Jalil*, 873 F.2d at 708. The defendant then has the burden of rebutting the prima facie case by supplying a legitimate, nondiscriminatory reason for the plaintiff's termination. *See Jalil*, 873 F.2d at 708. If the defendant provides such an explanation, in order to defeat a defendant's motion for summary judgment, the plaintiff must raise a genuine issue of material fact "by pointing to evidence which calls into question the defendant's intent." *Chipollini*, 814 F.2d at 899.

The Court is mindful of its obligation, when evaluating defendant's motion for summary judgment, to draw all inferences in favor of plaintiffs. However, as outlined below, even giving every deference to plaintiffs, the Court finds that plaintiffs have not demonstrated a genuine issue of material fact sufficient to defeat defendant's motion.

The Court must draw a number of inferences in plaintiffs' favor simply to make this analysis meaningful. First, although the Court has made no determination that plaintiffs constitute "employees" entitled to protection under the FLSA, the Court will assume for purposes of this discussion that plaintiffs are employees and thus are able to state a cause of action under 29 U.S.C. § 215(a)(3).

---

**9.** At least two cases discussing the employee/volunteer distinction are in accord. *See Rodriguez*, 866 F.Supp. at 1019; *Benshoff v. Virginia Beach*, 9 F.Supp.2d 610, 622–24 (E.D.Va.1998).

*Rodriguez* involved an unusual arrangement in which the plaintiff apparently worked full-time but without pay as a patrol officer for a town's police department, in order to qualify for employment by an adjacent county as a construction flagman. When the arrangement soured, the plaintiff sued the town under the FLSA. *Rodriguez*, 866 F.Supp. at 1015–16. The court held that the plaintiff was not a volunteer because it was undisputed that the plaintiff did not act for civic, charitable, or humanitarian purposes, but "was guided solely by the self-interested, though peculiar, intention of obtaining employment" in the other county. *Id.* at 1019.

In *Benshoff*, the court held that the plaintiff firefighters constituted volunteers because there was evidence before the court in the deposition transcripts of the plaintiffs that they were motivated to work as firefighters for civic, charitable, and humanitarian reasons. *Benshoff*, 9 F.Supp.2d at 623.

Plaintiffs, in filing their first complaint on October 1, 1995, alleging violations of the FLSA, engaged in activity that was specifically protected under the terms of 29 U.S.C. § 215(a)(3). The Court will also assume for purposes of this analysis that defendant's failure to reappoint plaintiffs as SLEOs for calendar year 1998 constituted "adverse action by the employer," did not merely constitute an exercise of its statutory authority to refrain from reappointing SLEOs for subsequent terms. *See* N.J.S.A. § 40A:14–146.14(a). Finally, the Court will assume that the length of time between the protected activity and the adverse action creates an inference of causality.[10] The Court assumes, therefore, that plaintiffs have presented all the elements of a *prima facie* case for retaliatory termination.

Defendant, however, has rebutted this *prima facie* case by providing a legitimate, nondiscriminatory reason for plaintiffs' termination. The Township asserts that it simply followed the recommendation presented by the chief of police in his December 12, 1995, memorandum, that the SLEO program be discontinued because it was proving costly and inefficient. This was not a situation where certain SLEOs had been singled out for termination; rather, the SLEO program as a whole was terminated. Notably, the termination of the SLEO program affected all SLEOs, not just the plaintiffs in the instant action. The applicable New Jersey statute permits, but does not require, the establishment of an SLEO unit—nor does it require that once established, an SLEO program must be continued. *See* N.J.S.A. § 40A:14–146.10(a).

Because defendant has provided a legitimate, nondiscriminatory reason for plaintiffs' terminations, the burden shifts to plaintiffs to demonstrate that a genuine issue of material fact exists sufficient to call into question defendant's proffered pretext. Plaintiffs have failed to present adequate evidence or arguments that dispute defendant's explanation.

■ Therefore, even after according plaintiffs the benefit of all inferences in their favor, plaintiffs have failed to defeat defendant's motion for summary judgment on this claim. The Court will grant summary judgment in favor of defendant on count two of plaintiffs' amended complaint.

## ADDITIONAL ARGUMENTS

Finally, the Court will dispose of a few lingering arguments presented by plaintiffs and defendant: plaintiffs' assertion that defendant's arguments are barred by judicial estoppel; plaintiffs' assertion that they are entitled to liquidated damages; defendant's argument that plaintiffs' claims fail because the jobs-in-blue were void ab initio; and defendant's argument that plaintiffs have failed to state a cause of action because they suffered no damages.

### A. Judicial Estoppel

The Court rejects plaintiffs' argument that defendant is judicially estopped from asserting that it is not an employer of plaintiffs because defendant argued in the alternative before the PERC that if it was held to be an employer of the SLEOs, it should be held to be a joint employer along with the subscribers.

■ The doctrine of judicial estoppel bars a party from asserting a position inconsistent with one previously asserted in another judicial proceeding. *See Ryan Operations, G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.1996). Not only must the party's position be inconsistent with a previously-asserted position, but the party must have asserted either or both positions in bad faith—"with intent to play fast and loose with the court." *See id.* The Court notes that asserting arguments in the alternative or inconsistent positions "does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage." *In re Chambers Dev. Co., Inc.*, 148 F.3d 214,

---

**10.** The Court notes, however, that in the absence of additional evidence provided by the plaintiff, a three-month separation between the protected activity and the termination has been held to be insufficient to permit the inference of a causal link between the two occurrences. *See, e.g., Jasmantas v. Subaru–Isuzu Automotive, Inc.*, 139 F.3d 1155 (7th Cir.1998); *Richmond v. ONEOK, Inc.*, 120 F.3d 205 (10th Cir.1997).

229 (3d Cir.1998). Plaintiffs have presented no evidence that defendant acted in bad faith or somehow acquired an "unfair advantage." The Court declines to apply judicial estoppel.

## B. Liquidated Damages

The Court makes no determination as to plaintiffs' entitlement to liquidated damages under the FLSA because the Court has made no determination as to plaintiffs' employment status under the FLSA.

## C. Jobs-in-blue Were Void ab Initio

Defendant argues that the SLEOs were barred at all times from working any jobs-in-blue under the terms of the Private Detective Act, N.J.S.A. § 40A:14–146.14(b), and thus the performance of such jobs-in-blue was illegal and void *ab initio*. Because the jobs-in-blue were illegal, argues defendant, plaintiffs were not entitled to rely upon their eligibility for such jobs as their motivation to perform uncompensated town duty.

The legality or illegality of plaintiffs' performance of jobs-in-blue is irrelevant to the determination of the Court in this opinion, which evaluates the SLEOs only in the performance of town duty subsequent to October 2, 1998.

## D. Defendant's Assertion that Plaintiffs Suffered No Damages

The Court rejects defendant's argument that plaintiffs have failed to state a cause of action because they have suffered no damages. Defendants have evidently misconstrued the object of plaintiffs' amended complaint, which is to seek payment of wages under 29 U.S.C. § 206 for all hours of town duty performed subsequent to the termination of plaintiffs' jobs-in-blue eligibility on October 2, 1995, and compensation for damages sustained as a result of defendant's purported retaliatory discharge of plaintiffs. The fact that defendant opposes plaintiffs' arguments means that plaintiffs' claims are subject to adjudication, but does not necessarily mean that plaintiffs' damages are nonexistent.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by plaintiffs will be denied. The motion for summary judgment filed by defendant will be granted as to the second count of the amended complaint.

Defendant's motion for summary judgment on the first count of the amended complaint will be held in abeyance pending limited discovery on the issue of plaintiffs' motivation for continuing to perform town duty subsequent to October 2, 1995. The parties are directed to conduct such discovery and submit their factual findings and any relevant legal argument to the Court within the thirty days of the attached Order.

## *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 17 day of November, 1998

ORDERED that the motion for summary judgment filed by plaintiffs is denied; and it is further

ORDERED that the motion for summary judgment filed by defendant is granted as to the second count of the amended complaint; and it is further

ORDERED that defendant's motion for summary judgment on the first count of the amended complaint will be held in abeyance pending limited discovery on the issue of plaintiffs' motivation for continuing to perform town duty subsequent to October 2, 1995. The parties are directed to conduct such discovery and submit their factual findings and any relevant legal argument to the Court within the thirty days of the date of this Order.